PER CURIAM.
We set out Judge Lynwood Smith’s “Order On Motion For Summary Judgment,” including the final judgment from which the plaintiff appeals, and we adopt that order as the opinion of this Court:
“I. FINDINGS OF FACT
“In December 1982, plaintiff [Wayne Lankford] and defendant [Richard A. Wit-mondt] encountered one another in the lobby of Chrysler Corporation Huntsville (a mutual customer). Both parties were ‘manufacturers’ representatives,’ engaged in the business of selling on commission electronic instruments or components to companies having need of such devices.
“Defendant was then president of International Scientific Instruments, Inc. (ISI), a firm which provided independent, commissioned sales representatives for manufacturers of electronic instruments.
“ISI began business in 1966 as a sole proprietorship, in defendant Witmondt’s garage. It was not incorporated until 1971. In 1982-83, it employed (in addition to defendant) four or five persons. At the present time, ISI exists in name only: it is not active, has no employees, and is not listed in either the telephone or city directories.
“Plaintiff then was Vice President of Technology Marketing Associates, Inc. (TMA), a firm which provided independent, commissioned sales representatives for manufacturers of electronic components.
“During the course of what apparently began as a casual conversation between two acquaintances who respected and liked one another, defendant learned that plaintiff was unhappy with his employment relationship at TMA. Plaintiff related a desire ‘to form his own company’ and described negotiations then pending with James Blue: a potential investor and source for start-up capital.
“That conversation led to meetings about the feasibility of a joint venture: the formation of a sales representative firm for manufacturers of electronic components. Those negotiations culminated in a contract executed by both parties on 31 March 1983. The document which reduced the understandings of the parties to writing was prepared by Louis Salmon, attorney for defendant.
“Except for some initial confusion, which flows from the similarity between the name and acronym of defendant’s existing corporation (International Scientific Instruments, Inc. (ISI)), and the name and acronym of the joint venture created by the subject document (International Scientific Components, Inc. (ISC)), the contract is clear and unambiguous:
“ ‘The purpose of the contract was to build a company, ISC, and we were building it jointly. I [Witmondt] was supplying the money and Wayne [Lankford] was going to do the salesmanship, and I was going to consult with him.’
“On the date plaintiff ceased employment with TMA, his base salary as Vice President was $28,000 per annum. In addition, plaintiff contends that during the five years he was employed by TMA, he also received bonuses ‘averaging’ $12,000 to $15,000 per year, and that he participated *852 in a TMA profit sharing and retirement plan. Nevertheless, defendant understood that plaintiff desired to leave TMA because the company was ‘holding a lot of money back and he wasn’t getting all he should have got.’
“During the seven-month existence of the joint venture, defendant invested substantial amounts of money, property, and services in the fledgling enterprise. Defendant gave plaintiff the use of office furnishings and a 1981 Chrysler Imperial automobile that had been purchased new for $16,000. (That car later was sold, and a new 1983 Buick Electra was purchased for plaintiff’s use.)
“Defendant provided plaintiff free office space, telephones, books, secretarial assistance, and sales assistance.
“ ‘ISI was picking up the majority of the expenses ... for Mr. Lankford, his secretary, and I [Witmondt] believe he apportioned a small amount of the expenses to the secretary of ISI for her to handle some taxes. The remainder of the expenses paid for was his own salary and secretary and his expenses.
“ ‘Plaintiff admits that he was allowed to use the individual sales representatives of International Scientific Instruments, Inc.’
“Defendant personally devoted one day per week to the venture: calling on customers, soliciting new product lines, and the like. On the date plaintiff was fired, defendant had invested $46,988 of his own money in the venture. By the date defendant closed the books on ISC, and it ‘ceased operations’ in December of 1984, he had invested more than $80,000 (not including the value of the services and property mentioned above) in the venture.
“By any standard of objective measurement, plaintiff failed miserably in his attempt to make ISC a profitable venture. After a seven-month association, defendant had paid plaintiff $46,988 in salary and expenses: more than $6,700 per month. Plaintiff estimated his salary and expenses to be $7,000 per month. Against those amounts, plaintiff produced only a few thousand dollars in commissions.
“Early in the venture, plaintiff and defendant prepared a chart of projected expenses and income for ISC’s first year of operation. Income (commissions received) was ‘expected to be zero’ during the first three months of operation. The estimates for the remainder of the year were modified several times: ‘we kept knocking them down, down, and down.’ Even so, plaintiff still failed to meet projections.... Gross sales during the short life of ISC were $176,700. Of that amount, the company ‘booked’ commissions of only $10,963. Not even all of that was collected.
“As evidence accumulated that plaintiff was neither frugal with defendant’s money, nor putting forth the effort required to get a new company off the ground, defendant became convinced he was throwing good money after bad.
“ ‘[I]t became my judgment that we had spent so much money and there was nothing coming in, and that we couldn’t make it, so it was just a business judgment.’
“After consulting legal counsel, defendant terminated the relationship. [At this point, Judge Smith’s order contained a chart reflecting both the projected and the actual commissions received by the plaintiff from July 1983 through March 1984.]
“II. CONCLUSIONS OF LAW
“The contract executed by these parties is not ambiguous. Consequently, extrinsic evidence is not admissible to vary or contradict the terms of that writing. See Schroeder, Hoffman, and Thigpen, Alabama Evidence, § 10-2(a) (1987).
“The parol evidence rule thus bars plaintiff’s claim that defendant breached an oral promise of ‘permanent’ employment with ISC. Under the terms of the parties’ contract, plaintiff’s employment — regardless of whether it is arguéd that such relationship existed with defendant, ISC, or ISI— was terminable at will. E.g., Montgomery v. Big B, Inc., 460 So.2d 1286, 1288 (Ala.1984).
“Even if such claim were not defeated by the parol evidence rule, it still would be *853 barred by defendant’s unrebutted assertion that plaintiffs performance was totally unsatisfactory.
“ ‘[Permanent employment will be held to contemplate a continuous engagement to endure as long as the employer shall be engaged in business and have work for the employee to do and the [employee] shall perform the service satisfactorily. ’
Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939) (emphasis supplied). See, also, Chastain v. Kelly-Springfield Tire Co., 733 F.2d 1479 (11th Cir.1984), a case in which the U.S. Court of Appeals (applying Alabama law) held that:
“ ‘an offer for lifetime employment must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation....
[[Image here]]
“ ‘ “A casual remark made at a meeting, a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation in such a contract. [Brown v. Safeway Stores, Inc., 190 F.Supp. 295, 299 (E.D.N.Y.1960).]” ’
“[Chastain v. Kelly-Springfield Tire Co., 733 F.2d at 1484.]”
“The parties’ contract is silent on one point. Paragraph 1 simply provides that a corporation to be known as International Scientific Components, Inc. ‘will be formed under the laws of the State of Alabama. ...’ The document specifies neither when, nor by whom, such action was to be accomplished. Hence, defendant could argue that plaintiff ‘had as much right to have it incorporated as [he] did.’
“On the other hand, it also can be argued that such silence indicates the existence of a latent ambiguity (e.g., Gibson v. Anderson, 265 Ala. 553, 92 So.2d 692 (1957)), or that this was a clear and obvious omission (see Alabama Evidence, supra, §§ 10-2(c), (d)), either of which case opens the door to extrinsic evidence of an alleged collateral agreement that defendant’s attorney (Louis Salmon) was to prepare the documents necessary to effect the parties’ stated intent.
“But, even if Mr. Salmon’s failure to proceed with incorporation procedures within a reasonable time after being requested to do so can be made the basis of a breach of contract claim against defendant, where are plaintiffs damages ? How can it be reasonably argued that defendant’s attorney’s failure to make plaintiff an officer and minority shareholder of an insolvent corporate entity — the liabilities of which grossly exceeded assets — injured plaintiff in any way? The claim is ludicrous. Any arguments to the contrary are as specious as they are speculative....
“Plaintiff’s claim that defendant breached the contract by failing to loan ISC $85,-000 prior to the date of his termination is equally specious. In the first place, defendant did not promise to loan the venture a specific dollar amount; rather, he agreed to extend credit to ISC ‘up to $85,000.’ In the second place, the contract does not specify the time frame during which such line of credit could be drawn against. Therefore, defendant’s loan of the aggregate amount of $46,988 over the seven-month period prior to plaintiff’s termination — and the amount of $85,291 by June of 1984 — does not constitute a breach of contract. In any event, plaintiff cannot recover damages for failure to loan money under the circumstances of this case.
“Plaintiff cannot recover on his claim that defendant breached the contract by failing to submit their disagreements to arbitration because:
“(a) Plaintiff himself never sought to invoke the arbitration provisions of paragraph 13; and
“(b) Plaintiff’s remedy for breach of that provision was a suit for specific performance. See Dobbs, Handbook on the Law of Remedies § 12.27, at p. 939 (1973).
“Plaintiff’s fraud claims may be the most implausible of all. There is not even a scintilla of evidence suggesting that, on the date the parties consummated their agreement, defendant had a present intent to deceive, or that he had no intention of carrying out his promises. Rather, when one considers the substantial amounts of *854 money, property, and services that defendant invested in this venture, it is obvious that, at its inception, defendant had every intention of making the enterprise a success.
“III. FINAL JUDGMENT
“In accordance with the foregoing findings of fact and conclusions of law, it is CONSIDERED, ORDERED, and ADJUDGED that summary judgment be, and the same hereby is, rendered in favor of all defendants_”
No error has been shown, and the judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES, SHORES and ADAMS, JJ., concur.