935 So.2d 431 (2006)
Robert F. PRINCE; The Prince Law Firm, P.C., as successor to Prince, Poole, Cross & Fischer, P.C.; Charles E. Pearson, P.C.; and Charles E. Pearson
v.
Phil POOLE.
1030755.
Supreme Court of Alabama.
January 27, 2006.
*433 Michael L. Edwards and Scott B. Grover of Balch & Bingham, LLP, Birmingham; and John A. Owens and Anna N. Hutcheson of Owens & Millsaps, LLP, Tuscaloosa, for appellants Robert F. Prince and The Prince Law Firm, P.C., as successor to Prince, Poole, Cross & Fischer, P.C.
W. Stancil Starnes, Laura Howard Peck, and Robin H. Jones of Starnes & Atchison, LLP, Birmingham; and Richard F. Ogle of Ogle, Liles & Upshaw, LLP, Birmingham, for appellants Charles E. Pearson, P.C., and Charles E. Pearson.
Joseph B. Mays, Jr., Michael D. McKibben, Matthew H. Lembke, and Marc James Ayers of Bradley Arant Rose & White, LLP, Birmingham; and Braxton Kittrell, Jr., of Gardner, Middlebrooks, Gibbons, Kittrell & Olsen, P.C., Mobile, for appellee.
SMITH, Justice.[1]
Robert F. Prince, The Prince Law Firm, P.C., Charles E. "Ward" Pearson, P.C., and Charles E. Pearson appeal from a summary judgment entered by the Tuscaloosa Circuit Court in favor of Phil Poole on his breach-of-contract claims in this action. We reverse and remand.

Facts and Procedural History
Beginning in 1999, 38 individual plaintiffs filed 22 separate lawsuits involving claims for damage allegedly caused by an underground gasoline spill in or near Moundville ("the Moundville gasoline litigation"). A settlement of those claims was reached in January 2003. This appeal involves a dispute over an alleged fee-sharing or fee-splitting agreement among the attorneys in the Moundville gasoline litigation.
It is undisputed that Charles E. Pearson of Charles E. Pearson, P.C. (Charles E. Pearson and Charles E. Pearson, P.C., are hereinafter referred to jointly as "the *434 Pearson appellants"), and Robert F. Prince of Prince, Poole & Cross, P.C. (Robert F. Prince and Prince, Poole & Cross, P.C., and the successor law firms are hereinafter referred to jointly as "the Prince appellants"),[2] were the principal attorneys who prosecuted the Moundville gasoline litigation.
Poole, a "name" partner in Prince, Poole & Cross, P.C.,[3] had an unwritten arrangement with Prince, Poole & Cross, P.C., under which he received 50% of the attorney fees earned from cases that he secured for or referred to the firm.[4] Poole apparently was able to work out this arrangement with Prince, Poole & Cross, P.C., because of what his brief describes as "Poole's unmatched connections, relationships and influence in the Town of Moundville."
Poole contends he first became aware of the claims underlying the Moundville gasoline litigation in early 1996 when, he says, several landowners affected by the gasoline spill contacted him. Poole learned from those landowners that a town meeting concerning those claims would be taking place in February 1996, and he contends that, because he could not attend the meeting, he contacted Prince, Poole & Cross, P.C., to inform the firm of the meeting. Poole argues that by contacting the firm regarding the meeting, he "presented" the Moundville gasoline litigation to the Prince appellants.
Silas G. "Dell" Cross, Jr., a principal in Prince, Poole & Cross, P.C., attended the February 1996 town meeting, Poole contends, at his request. At that meeting, Cross saw Pearson's brother, Greg Pearson, who is also an attorney. Cross talked to Greg Pearson and informed him, Poole contends, that Poole had been contacted by several landowners about the gasoline spill, including William B. "Buster" Chandler, whose case eventually became the only Moundville gasoline litigation to go to trial. Thus, Poole argues that he, in effect, also presented the Moundville gasoline litigation to the Pearson appellants.
Pearson and Prince dispute Poole's contentions that he presented the Moundville gasoline litigation to them. Prince asserts he first became aware of the claims underlying the Moundville gasoline litigation in February 1996, and Pearson contends he learned of the claims from his brother, Greg. Pearson contends that by the time of the February 1996 meeting, Greg already had been contacted by several landowners, including Buster Chandler, regarding the claims. Pearson testified that after the February 1996 town meeting, Greg told Pearson that he had seen Cross there. Pearson stated that Cross's presence at the town meeting caused him to assume that Prince, Poole & Cross, P.C., was involved in representing the landowners in the Moundville gasoline litigation.
Pearson asserts that he contacted Prince to see if Prince would be interested in "associating" to jointly prosecute the *435 Moundville gasoline litigation. Pearson and Prince claim that at some point before July 1996, they orally agreed to associate and to prosecute the Moundville gasoline litigation together, splitting expenses and fees equally. Prince claims that after his initial agreement with Pearson, he talked with Poole about lowering Poole's fee percentage from 50% to 33 1/3% for Moundville gasoline litigation cases that Poole had contributed or had referred to the firm. In July 1996, Pearson, Prince, and Poole reached an oral agreement ("the July 1996 agreement") regarding the Moundville gasoline litigation. The terms of the July 1996 agreement, however, are disputed.
Regarding the splitting of fees under the July 1996 agreement, Poole claims that he, Prince, and Pearson agreed to "pool"[5] all the Moundville gasoline litigation cases and split the fees equally, regardless of which attorney had contributed or had referred the case.[6] Prince's deposition testimony on this point is somewhat conflicting. He first testified that the initial agreement was that Poole would receive an equal share of the fees from all of the cases. Prince later explained in his deposition, however, that the parties agreed to that arrangement only because it was understood that Poole would be contributing virtually all of the cases. But, Prince contends, "[w]hen Poole failed to carry through with that promise, and other lawyers began bringing cases, the original understanding lost all applicability." (Prince's reply brief, p. 22 n. 16.)
Pearson's testimony regarding the July 1996 agreement directly conflicts with Poole's understanding of that agreement. According to Pearson, he agreed to split fees equally with Prince and Poole only on those cases Poole secured or referred; on cases not secured or referred by Poole, Pearson and Prince were to split the fees 50/50.
The parties agree that under the July 1996 agreement Poole was not responsible for any of the litigation expenses because Prince and Pearson had agreed to split the costs of the litigation equally. The parties, however, dispute Poole's obligations under the July 1996 agreement. Poole contends that he had a duty only to "refer" any Moundville gasoline litigation case that came to him, but he claims he had no other obligations under that agreement.
Prince's understanding of the July 1996 agreement, however, was that Poole would be contributing virtually all of the Moundville gasoline litigation cases. Similarly, Pearson believed that Poole agreed to contribute Moundville gasoline litigation cases. Pearson also claims that Poole agreed to "work" on the Moundville gasoline litigation. Pearson's testimony on that point, however, is not very specific; he testified that Poole agreed to "handle" necessary work with the Alabama Department of Environmental Management arising out the Moundville gasoline litigation and that Poole generally agreed to "work" on the Moundville gasoline litigation.
Eventually, 38 individual plaintiffs signed contingency-fee contracts with either *436 Charles E. Pearson, P.C., or Prince, Poole & Cross, P.C. As mentioned, those 38 plaintiffs filed 22 separate lawsuits. On January 17, 2000, before any of the Moundville gasoline litigation cases had been resolved by trial or otherwise, Poole, Cross, and Fischer left the law firm of Prince, Poole, Cross & Fischer, P.C., and formed a new firm  Cross, Poole & Fischer, L.L.C.
In an effort to wrap up the dissolution of Prince, Poole, Cross & Fischer, P.C., Prince, Cross, and Fischer executed a written "exit agreement" on January 27, 2000.[7] Among other things, the exit agreement exempted from its coverage the Moundville gasoline litigation.[8] Paragraph 2 of the exit agreement stated that "[t]he allocation of revenues, attorney fees and reasonable and necessary case expenses arising out of the [Moundville gasoline litigation would] be addressed by a separate agreement between [Prince, Cross, and Fischer]."
The exit agreement did not, however, end the dissolution dispute. In particular, the continuing dispute focused on the division of fees from the Moundville gasoline litigation. In a series of letters between Cross, Fischer, and Prince in early February 2000, the conflict escalated to the point that Cross and Fischer accused Prince of breaching the exit agreement because, they alleged, Prince refused to execute a separate agreement pertaining to the Moundville gasoline litigation.
Prince claims that in an effort to resolve the dissolution dispute, he asked Pearson to make a concession on the fees to which he was entitled from the Moundville gasoline litigation. Pearson agreed to Prince's request because, Pearson says, the dissolution dispute was interfering with the prosecution of the Moundville gasoline litigation. Through a series of telephone calls and a meeting on February 6, 2000, an oral agreement was reached regarding the division of fees from the Moundville gasoline litigation.
On February 15, 2000, Pearson sent a letter to Cross, Poole, Fischer, and Prince; each attorney signed it ("the February 15 letter"). The February 15 letter states:
"RE: Fee Splits for Moundville Gasoline Cases v. Chevron & Plantation Pipe Line

"Dear Gentlemen:
"This will confirm the fee splits and other issues that were discussed and generally endorsed by everyone at the end of the day on Sunday, February 6th. The Fee Splits and understanding expressed by this letter agreement are applicable only to the following lawsuits *437 and/or cases: (1) the Chandler et al lawsuits currently filed against Chevron, Plantation Pipe Line, CH2MHill and Ron Clary (or some combination of said defendants) specifically in regard to the gasoline spill/contamination that originated at the terminal facilities of Chevron and Plantation Pipe Line located on and adjacent to 2nd Avenue in Moundville, Alabama (the `Chevron/PPL 2nd Avenue contamination spill'); (2) such additional lawsuits and/or cases as may be obtained or filed hereafter by any of the undersigned parties for any new or existing clients specifically and only in regard to the said Chevron/PPL 2nd Avenue contamination spill; and (3) any class action filed for protection of the Gordo Aquifer from the gasoline spills that have occurred in the area of the Chevron/PPL 2nd Avenue contamination spill (the `Gordo Aquifer Class Action'). Cases and/or lawsuits as described in part IV below are expressly excluded from operation of the fee splits set forth below.
"I. Fee Splits

"James H. Seale 10% .100
Silas G. Cross, Jr. & Erby J.
 Fischer 8% of 90% .072
Phil Poole 30% of 90% .270
Robert F. Prince 26% of 90% .234
Charles E. Pearson, P.C. and
 H. Gregory Pearson, P.C. 36% of 90% .324
 _____
Total 1.000

"II. Funding for Costs
"Charles E. Pearson and Robert F. Prince will continue to advance all (100%) of the funding for costs of litigation for the Chevron/PPL 2nd Avenue contamination spill, as to which costs all of the Fee Splits indicated above will be subject. Everyone acknowledges and understands that loans and loan costs (including interests and loan fees relating thereto) have been and will continue to be secured and incurred by Charles E. Pearson and Robert F. Prince from a third party bank in their sole discretion for the funding contemplated to cover the costs of the subject litigation. Such loans, interest and loan fees are mutually agreed to be a legitimate cost of the litigation to which all Fee Splits are subject and subordinate. Regardless of allocations (for client purposes) of the foregoing costs of litigation to any particular case, all incurred costs will be repaid and/or reimbursed first (out of first available proceeds of any recovery) before distribution of fees according to the Fee Splits indicated above. Regardless of the outcome of the litigation made the basis of this agreement, it is understood and agreed that there shall be no recourse against Silas G. Cross, Jr., Phil Poole, Erby J. Fischer or Cross, Poole & Fischer, L.L.C. for the recovery of expenses or cost incurred in the prosecution of the litigation. The obligation for cost and expenses in the funding of this litigation shall be borne solely by Charles E. Pearson and Robert F. Prince.
"III. Gordo Aquifer Class Action
"The Gordo Aquifer Class Action may be filed by any of the undersigned parties. As among the undersigned partiesthere shall be two groups. Group `A' shall be composed of Silas G. Cross, Jr., Phil Poole and Erby J. Fischer. Group `B' shall be composed of Charles E. Pearson and Robert F. Prince. Each group shall have the option to participate in any Gordo Aquifer Class Action for up to fifty percent (50%) of the attorney fees generated. A group which chooses to participate shall also be obligated for a proportionate share of the costs and expenses of said litigation. The proportionate share of costs and expenses shall be equal to the fee percentage received by the group. Additionally, *438 any group so participating shall be obligated for their proportionate share of the workload associated with the prosecution of the litigation. A group may elect not to participate, in which event such non participating group's percentage will then be transferred to the participating group. In the event the Gordo Aquifer Class Action is referred to other attorneys and a non-cost bearing, non-workload bearing referral fee is retained, all of the undersigned parties will have their respective fee split percentages in such referral fee. The provisions of this part III are only applicable to a Gordo Aquifer Class Action and are not applicable to individual cases that seek injunctive relief and/or damages. The provisions of part II above as to Funding for Cost are not applicable to the Gordo Aquifer Class Action.
"IV. Excluded Cases and Litigation
"All of the parties to this letter agreement are practicing attorneys. Each party to this letter agreement acknowledges and recognizes the respective rights of the others without obligation hereunder to continue to represent clients, enter into client contracts, and handle client cases and litigation that do not specifically include claims occasioned by the Chevron/PPL 2nd Avenue contamination spill. Any and all client contracts, cases and litigation that do not specifically include claims occasioned by the Chevron/PPL 2nd Avenue contamination spill are not subject to the Fee Splits and Funding for Costs provisions of this letter agreement, regardless of whether such claims, contracts, cases and/or litigation involve the same or similar plaintiffs and/or the same or similar defendants. It is acknowledged that there are other possible or existing contamination spills and/or leaks in or near the Moundville area by Colonial Pipeline, Hunt Oil, and Plantation Pipe Line Company that may give rise to claims by some of the same plaintiff landowners that are involved in the Chevron/PPL 2nd Avenue contamination spill. Such other possible or exiting contamination spills and/or leaks are not subject to the Fee Splits and Funding for Costs provisions set forth above.
"Sincerely,
"/s/ Charles E. Pearson
"Charles E. Pearson
"Stipulated and Agreed to by the undersigned:
"/s/ Charles E. Pearson /s/ Erby J. Fischer
"Charles E. Pearson Erby J. Fischer
"/s/ Robert F. Prince /s/ Phil Poole
"Robert F. Prince Phil Poole
"/s/ Silas G. Cross, Jr.
"Silas G. Cross, Jr."
Despite the February 15 letter, however, disagreement regarding the dissolution of Prince, Poole, Cross & Fischer, P.C., continued. In April 2000, Prince exchanged letters with Cross and Fischer regarding an alleged oral agreement by Cross and Fischer to pay Prince for firm-related expenses. The dispute escalated, and in May 2000 Prince filed an action in the Tuscaloosa Circuit Court for a declaratory judgment against defendants Cross, Fischer, Poole, and the law firm of Cross, Poole & Fischer, L.L.C. Among other things, Prince's complaint sought a judgment declaring that the defendants were in material breach of the exit agreement, the February 15 letter, and any other written and oral agreements between the parties.
On May 31, 2000, Cross, Fischer, and Poole filed an answer and a counterclaim. They asserted a claim of breach of contract and sought an accounting and a declaration that the exit agreement and the February 15 letter were valid and enforceable agreements that they had not materially *439 breached. The counterclaim also asked the court to determine whether Pearson and Charles E. Pearson, P.C., were necessary and indispensable parties to the declaratory-judgment action.
On July 5, 2000, Pearson sent a letter to Cross, Poole, Fischer, and Prince ("the July 5 letter"). In the July 5 letter, Pearson attempted to terminate what he described as the "association" of each of the attorneys by the February 15 letter. The July 5 letter states:
"It has come to my attention that a contention has been alleged that I should be made a party in your current lawsuit regarding the split-up of Prince, Poole and Cross.[[9]] I do not understand or appreciate any necessity for me to be involved in your internal affairs, and particularly do not see it as appropriate action for you to involve me, an associating attorney, in your dispute. The Moundville gasoline contamination cases have reached an important point in my effort to get one or more up for trial. The casework on the Moundville cases is time consuming and difficult enough as it is without having to address the contention that has been raised to involve me in your lawsuit. I do not understand why I have been singled out among what must be a number of attorneys who associated either Bob [Prince] or your former P.C. to assist the pursuit of legal claims on behalf of clients.
"I am therefore terminating my earlier association of each of you in regard to my client cases and contracts that are involved in the Moundville gasoline contamination litigation. In particular, I want to make it clear that the association of each of you as may be reflected by my letter of February 15, 2000, in regard to my specific Moundville clients/contracts is hereby withdrawn. As each of you are well aware, my concession of fee percentage reflected in such letter of February 15th was purely a unilateral decision by me to reduce my fee percentage merely in an effort to accommodate Bob, and was not the result of any consideration whatsoever being granted to me by any of you. Other than Bob, no work has been done nor any financial investment made by the rest of you in regard to my Moundville clients/contracts since my February 15th letter.
"My termination of your association pursuant to this letter results in a reversion to the original understanding that I had reached with Phil Poole and Bob (at the outset of the Moundville contamination litigation) as to Phil having a referral fee as to certain Moundville cases. Phil and I need to discuss the specifics of the original understanding, but I am proceeding on the basis that the original understanding as to Phil is back in place and I will honor such understanding as to Phil."
On August 4, 2000, attorney James Jenkins responded by letter ("the August 4 letter") to the July 5 letter. Jenkins wrote the August 4 letter on behalf of Fischer, Cross, and, Poole contends, Poole.[10] The *440 August 4 letter protested Pearson's interpretation and attempted revocation of the February 15 letter in the July 5 letter. The August 4 letter maintains that "[t]he 15 February 2000 letter is an enforceable contract between the parties who signed. The agreement supplants and replaces any previous agreements between my clients' former firm, Phil Poole individually and [Pearson's] law firm (and/or [Pearson] individually)."
On April 11, 2001, Prince, Cross, and Fischer settled their disputes regarding the dissolution of Prince, Poole, Cross & Fischer, P.C. As part of the settlement, Cross and Fischer surrendered any claim to fees from the Moundville gasoline litigation. The settlement resulted in the dismissal of Cross, Fischer, and the law firm Cross, Poole & Fischer, L.L.C., from Prince's declaratory-judgment action, leaving Poole as the only remaining defendant.
In October 2001, Prince and Pearson obtained a jury verdict of $43.8 million on behalf of Buster Chandler against Plantation Pipeline Company in the first of the Moundville gasoline litigation cases to go to trial. In a letter to Pearson dated February 15, 2002, counsel for Poole asked whether Pearson would be distributing, in accordance with the February 15 letter, a share of the fee earned on Chandler's case. Pearson contends this was the first time since the July 5 letter he had been contacted by Poole regarding the Moundville gasoline litigation.
On February 25, 2002, Pearson filed a motion to intervene in the dissolution litigation between Prince and Poole; the trial court later granted Pearson's motion. Pearson's complaint in intervention sought a declaratory judgment regarding the validity of the February 15 letter and the nature of his obligations to Poole under the February 15 letter.
Poole answered Pearson's complaint in intervention and filed a counterclaim against Pearson and amended his counterclaim against Prince. Poole's counterclaims included breach-of-contract claims against Pearson and Prince.
In October 2002, the trial court ordered the parties to mediate the dispute, but the mediation efforts failed. Pearson and Prince contend that on October 14, during the mediation, Poole learned that confidential settlement negotiations were ongoing regarding the Moundville gasoline litigation. Poole testified at his deposition that on the evening of October 14, he, along with his father and brother, contacted 11 of the plaintiffs in the Moundville gasoline litigation. The Pooles attempted to obtain from those plaintiffs written consents stating that Poole was one of their attorneys in the Moundville gasoline litigation and giving Poole authority to file notices of appearance on their behalf.
On October 15 and soon thereafter Poole filed notices of appearances on behalf of several of those plaintiffs. In some instances, however, Poole had not been a party to the discussions his father or brother had with the Moundville gasoline litigation plaintiffs, nor had Poole been present when some of the written consents were obtained from those plaintiffs.[11]
*441 On October 15, 2002, five of the Moundville gasoline litigation plaintiffs who had been contacted by the Pooles signed notarized letters demanding that Poole destroy the written consents the Pooles had obtained on October 14.[12]
In January 2003, a settlement of the Moundville gasoline litigation was reached. As part of the settlement, each plaintiff signed a written statement that included the following acknowledgment: "Robert Prince and Charles E. Pearson represent all Claimants who are Plaintiffs in connection with the Lawsuits and ... neither Phil Poole, Erby Fischer, nor Dell Cross represents any Claimants who are Plaintiffs in connection with the Lawsuits." Pearson and Prince did not disburse to Poole any of the attorney fees from that settlement.
In March 2003, seeking 27% of the fees from the Moundville gasoline litigation, Poole moved for a summary judgment as to his breach-of-contract counterclaim and submitted evidentiary materials in support of his motion. Pearson and Prince responded to Poole's summary-judgment motion and filed a motion and supporting materials for a partial summary judgment as to Poole's breach-of-contract counterclaim.
The trial court afforded the parties several opportunities to submit supplemental evidence in support of their respective motions, and the court held two hearings relating to the pending summary-judgment motions.
Following Prince's submission of an affidavit in opposition to Poole's motion for a summary judgment, Poole moved to strike two parts of the affidavit that, Poole contended, contradicted Prince's earlier sworn deposition testimony. Poole objected to a portion of Prince's affidavit in which Prince asserted that Poole had orally agreed to pay for various firm-related expenses. Poole also objected to those parts of the affidavit in which Prince asserted that Poole had assumed and had failed to perform obligations not mentioned in the February 15 letter. Prince filed a response to Poole's motion to strike, but the trial court granted Poole's motion.
During the pendency of the parties' summary-judgment motions, the trial court, at Poole's request, ordered Prince and Pearson to produce information regarding the total amount of attorney fees resulting from the settlement of the Moundville gasoline litigation. Following the trial court's granting of Poole's motion to compel the information, Prince and Pearson produced documents, which were placed under seal, showing the total amount of attorney fees.
The trial court then granted, on January 5, 2004, Poole's motion for a summary *442 judgment. In a three-page order, the trial court stated, in relevant part:
"The Court has considered the relevant legal authorities, the parties' oral arguments, the evidence in the record, and the parties' written submissions .... Based on its review of these items, the Court finds that there is no genuine issue of material fact as to Poole's breach of contract count, and Poole is entitled to judgment in his favor on this count as a matter of law....
"It is therefore ORDERED, ADJUDGED, and DECREED that Poole's Motion for Summary Judgment as to His Breach of Contract Count is GRANTED; Pearson's Motion for Partial Summary Judgment is DENIED; and Prince's Motion for Partial Summary Judgment, insofar as it applies to Poole's breach of contract count, is DENIED. Summary judgment is entered in favor of Poole and against Charles E. Pearson, P.C., Charles E. Pearson, Robert F. Prince, The Prince Law Firm, P.C., and The Prince-Patterson Law Firm, P.C.,[[13]] on Poole's count for breach of contract in the amount of $4,755,644.20 plus prejudgment interest...."
The trial court made its summary judgment in Poole's favor final under Rule 54(b), Ala. R. Civ. P. The trial court also entered an order denying two motions filed by Pearson to strike as untimely supplemental evidentiary submissions filed by Poole on September 9, 2003.

Standard of Review
The standard for reviewing a summary judgment is well settled:
"This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce `substantial evidence' as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989)."
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).

Analysis
A summary judgment in Poole's favor on his breach-of-contract claim is appropriate only if there is no disputed issue of material fact with respect to any of the following: "(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and *443 (4) damages." Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted). Pearson and Prince raise several substantive objections to the trial court's summary judgment in this case. Those challenges to the trial court's finding that an enforceable contract existed fall into five general categories: (1) consideration and formation, (2) interpretation and parol evidence, (3) performance, (4) equitable issues, and (5) public policy. Pearson and Prince also raise two procedural objections to the summary judgment: Pearson challenges the trial court's denial of his motion to strike as untimely Poole's supplemental submissions in support of his motion for a summary judgment, and Prince challenges the trial court's order granting Poole's motion to strike portions of Prince's affidavit.
Although Pearson and Prince have raised a number of substantive and procedural challenges to the summary judgment in Poole's favor on the breach-of-contract claim, resolution of this case requires discussion of only two issues: the trial court's application of the parol-evidence rule and the trial court's striking of portions of Prince's affidavit.[14] We conclude that the summary judgment was inappropriate because Pearson and Prince have presented substantial evidence creating a genuine issue of material fact as to the obligations Poole assumed under the parties' agreement regarding the Moundville gasoline litigation and whether Poole performed those obligations.

I.

A.
Many of Pearson and Prince's substantive challenges rely upon parol evidence, that is, evidence other than the language of the February 15 letter. Thus, we must decide whether Pearson and Prince were entitled to introduce parol evidence, and, if so, whether that parol evidence reveals an issue of disputed material fact so that summary judgment was inappropriate.
Pearson and Prince contend that they were entitled to introduce parol evidence because, they argue, the February 15 letter does not contain a merger clause and was not intended to be a complete integration of the parties' agreement. Pearson and Prince argue that the February 15 letter effected only a partial integration of the parties' agreement, and they contend  and offer parol evidence suggesting  that Poole assumed obligations not mentioned in the February 15 letter and that Poole failed to perform those obligations.
Poole responds by arguing that the February 15 letter is an unambiguous contract and therefore parol evidence is inadmissible to vary or add to its terms. Poole relies upon this Court's decision in Southland Quality Homes, Inc. v. Williams, 781 So.2d 949, 953 (Ala.2000), for the proposition that "[i]f a contract is unambiguous on its face, there is no room for construction and it must be enforced as written."
Poole's reliance upon Southland Quality Homes is not without merit; unambiguous contracts must be enforced as written. Certainly the portion of the February 15 letter most beneficial to Poole  that is, the part outlining the percentage of the fees each party is to be awarded  is clear and unambiguous because, under that part, Poole is to receive 27% of the fees from the Moundville gasoline litigation. But Pearson and Prince have contended *444 throughout this case that the February 15 letter is not and was not intended to be the complete expression of the parties' agreement. They contend that the parties' agreement was partly oral and partly written  that is, they argue that the writing at issue (the February 15 letter) did not completely integrate the parties' agreement and that, therefore, parol evidence of other terms is admissible. See Smothers v. Henderson, 531 So.2d 657, 657-58 (Ala.1988) (discussing a breach-of-contract case in which the parties' agreement was partly oral and partly written). See also Lankford v. Witmondt, 528 So.2d 850, 853 (Ala.1988) (stating that either a "`clear and obvious omission'" or silence in a contract that "`indicates the existence of a latent ambiguity ... opens the door to extrinsic evidence of an alleged collateral agreement'" (quoting trial judge's order)).
We agree with Pearson and Prince. This Court has stated that the parol-evidence rule does not apply in every instance where there is a written contract:
"The applicability of the parol evidence rule necessarily rests upon the existence of a valid written instrument that completely and accurately expresses the obligations assumed by or imposed upon the parties. The very purpose of the parol evidence rule is to protect the verity of such an instrument. As noted by this Court in Hibbett Sporting Goods, Inc. v. Biernbaum, 375 So.2d 431, 434 (Ala.1979), quoting Sellers v. Dickert, 185 Ala. 206, 213, 64 So. 40, 43 (1913), `[t]he implication, at least, is that the executed writing contains all stipulations, engagements and promises the parties intend to make or to assume, and that all previous negotiations, conversations, and parol agreements are merged in the terms of the instrument.' In other words, the parol evidence rule does not apply to every contract of which there exists written evidence; it applies, instead, only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their complete agreement. Biernbaum, supra at 434, citing 3 Williston, Contracts, § 633."
First Commercial Bank v. Spivey, 694 So.2d 1316, 1326-27 (Ala.1997).
Normally, the words used by the parties in a written contract determines whether the parties intended the writing to be their complete agreement. The parties can express their intention that a written contract serves as their complete agreement by including a merger clause in the written contract. Poole argues, in effect, that the parties did just that by including in the February 15 letter the following sentence: "This will confirm the fee splits and other issues that were discussed and generally endorsed by everyone at the end of the day on Sunday, February 6th." We disagree with Poole's characterization of that sentence as a merger clause.
Justice Woodall, writing for a majority of this Court, has explained, "[a] `merger clause' is `a clause which states that all oral representations or agreements are merged into and subsumed by the written document of which the clause is a part.'" Belmont Homes, Inc. v. Law, 841 So.2d 237, 240 (Ala.2002) (quoting Sunchase Apartments v. Sunbelt Serv. Corp., 596 So.2d 119, 122 (Fla.Dist.Ct.App.1992)). The sentence of the February 15 letter that Poole insists acts as a merger clause does not state that the February 15 letter represents the entire agreement of the parties. A clause stating that a document "confirms the fee splits and other issues that were discussed and generally endorsed" is not the same as a clause stating that "all oral representations or agreements are merged into and subsumed by the written document of which the clause *445 is a part," and examples of contractual merger clauses in Alabama caselaw illustrate this point.[15] We conclude, therefore, that this sentence from the February 15 letter does not operate as a merger clause.
Moreover, the remainder of the February 15 letter does not reveal that the parties intended for the letter to serve as a complete integration of the parties' agreement. Instead, the language of the February 15 letter accomplished a partial integration of the parties' agreement because it reduced to writing the parties' agreement as to only the four issues it addresses: (1) fee-split percentages for the Moundville gasoline litigation; (2) funding for costs of the Moundville gasoline litigation; (3) division of the potential fees and expenses from the "Gordo Aquifer Class Action" if such an action were filed; and (4) those claims or cases that explicitly were not subject to the "Fee Splits" and "Funding for Costs" provisions of February 15 letter. The February 15 letter does not, however, address the parties' respective obligations in prosecuting the Moundville gasoline litigation. See Herring v. Prestwood, 379 So.2d 548, 552 (Ala.1979) (opinion on application for rehearing) ("`If the writing is final but not complete, it is partially integrated and consistent terms only can be supplied by extrinsic evidence.'") (quoting Hibbett Sporting Goods v. Biernbaum, 375 So.2d 431, 437 (Ala. 1979) (Torbert, C.J., dissenting)). See also 29A Am. Jur. 2d Evidence § 1116 (1994) ("A `partial integration' is a written instrument which has not been adopted by the parties as a complete and exclusive statement of the terms of the agreement. Parol evidence of consistent additional terms may supplement an otherwise incomplete document. Parol evidence is admissible to prove the part of a nonintegrated written agreement that has not been reduced to writing, but is not admissible with regard to the part that has been reduced to writing. In addition, in order to be admitted, the extrinsic evidence must not contradict or be inconsistent with the clear terms of the writing." (footnotes omitted)).
As Pearson and Prince argue, the express terms of the February 15 letter do not place an obligation on anyone  including Pearson, Prince, or Poole  to prosecute the Moundville gasoline litigation.[16] However, Pearson and Prince contend that if there were to be fees to split from the Moundville gasoline litigation, the litigation *446 necessarily would have to be prosecuted. Thus, Pearson and Prince argue that the parties' respective obligations to prosecute the cases are terms omitted from the February 15 letter and, they contend, they are entitled to introduce parol evidence of those terms. We agree. Lankford, 528 So.2d at 853; Herring, 379 So.2d at 552. See 29A Am. Jur. 2d Evidence § 1116; William A. Schroeder & Jerome A. Hoffman, Schroeder and Hoffman on Alabama Evidence § 10-9(c) (3d ed. 2000) ("[W]here it is clear that a written instrument was not intended to reflect the full agreement of the parties, the [parol-evidence] rule allows parties to present additional facts not contained in the instrument for the purpose of supplementing the terms set out in the writing. The case for parol evidence is most clear-cut where the document, on its face, indicates an omission of terms. Thus, . . . . clear and obvious omissions in deeds have been the basis for allowing parol evidence where an instrument contained an `indefinite' description of real property, or where `valuable consideration' was recited, but not a specific consideration." (footnotes omitted)).
Pearson and Prince contend that Poole agreed to obligations not delineated in the February 15 letter and that Poole failed to perform those obligations.[17] In particular, Pearson argues that Poole agreed to assist in working on the Moundville gasoline litigation and to work to end the dissolution dispute with Prince's former firm; after the February 15 letter, Pearson contends, Poole neither worked on the Moundville gasoline litigation nor worked to end the dissolution dispute.
Prince, in his affidavit, testified that the February 15 letter was only a part of the parties' overall agreement and that "Poole was expected to refer new cases relating to the Moundville gasoline spill, assist with state agencies, and be available to assist with jury selection and at trial." Prince testified, however, that Poole did not perform any of those obligations after the February 15 letter was written.
Poole disputes Pearson and Prince's claims that he assumed obligations other than what is expressed in the February 15 letter. Poole maintains that he was obligated "only to include in the pooled cases any Moundville gasoline case that came his way, and there is no evidence that he breached that requirement." (Poole's brief, p. 53.)
To resolve Poole's argument regarding his obligations under the February 15 letter in Poole's favor would necessarily require us to find that the February 15 letter is a completely integrated agreement.[18]
*447 We, however, have concluded otherwise. Pearson and Prince have presented evidence from which the fact-finder could conclude that the parties' agreement included Poole's assuming obligations other than what is expressed in the February 15 letter, such as agreeing to work on the Moundville gasoline litigation, to assist with state agencies in pursuing the Moundville gasoline litigation, or to work to end the dissolution dispute with Prince's former firm. If the fact-finder were to conclude that Poole had indeed assumed one or more of the additional obligations Pearson and Prince allege he assumed, the fact-finder could also conclude, based upon Poole's admission that he did "nothing" after the parties executed the February 15 letter, that Poole failed to perform those obligations. A dispute of material fact therefore exists, and summary judgment was inappropriate.

B.
Related to the issue of the proper role of parol evidence in this case are three decisions  two by this Court and one by the Court of Civil Appeals  that the parties vigorously contend should control the resolution of this case. Poole argues that this case is most analogous to Ex parte Counts, 683 So.2d 968 (Ala.1996); Pearson and Prince argue conversely that this case is more analogous to Gamble v. Corley, Moncus & Ward, P.C., 723 So.2d 627 (Ala. 1998), and Gaines, Gaines & Gaines, P.C. v. Hare, Wynn, Newell & Newton, 554 So.2d 445 (Ala.Civ.App.1989).
In Counts, Stockstill, a Louisiana attorney, associated Counts, an Alabama attorney, on March 14 or 15, 1993, to assist Stockstill in representing two individuals in a civil action in Baldwin County, Alabama. Stockstill informed Counts that the statutory limitations period for the claims would expire on March 17, 1993. The two attorneys reached an oral agreement, which Stockstill confirmed by letter the next day. 683 So.2d at 968. The letter stated:
"`It is my understanding that you will prepare a Complaint on behalf of our Clients ... and file same in Baldwin County, Alabama prior to the Statute of Limitations date, i.e. March 17, 1993.
"`It is also my understanding that I will be involved in all phases of discovery *448 and trial, and you will assist me in that regard. Our Firm will advance all funds necessary for case development and trial. We have a contingency fee of 33 1/3 percent with our Clients. The fee will be apportioned 60 percent to our Firm and 40 percent to you.
"`Presently, I am in negotiation with State Farm regarding settlement and I will keep you informed in that regard.'"
683 So.2d at 969. When Counts received that letter, he filed the complaint, as he had agreed to do. 683 So.2d at 969.
On March 23, 1993, Stockstill mailed a letter to Counts stating that the claims of one of the individuals had been settled. Counts contacted Stockstill after he received the letter. Stockstill indicated that the claim had settled for $55,000, but Stockstill stated he did not intend to split any resulting fee with Counts because, Stockstill contended, the claim "had been settled before Counts filed the complaint and that Counts had not helped in discovery or trial and therefore was entitled only to compensation based on a theory of quantum meruit." 683 So.2d at 969. Stockstill later admitted, however, that the settlement might have occurred after Counts had filed the complaint. 683 So.2d at 969.
Counts sued to recover 40% of the fee. The trial court enforced the fee-splitting agreement and entered a judgment in Counts's favor for $7,333.33. The Court of Civil Appeals, however, reversed the judgment and remanded the cause to the trial court, concluding that Counts was entitled to recover only under a theory of quantum meruit. Glenn Armentor Law Corp. v. Counts, 683 So.2d 964, 965-66 (Ala.Civ. App.1994).
This Court reversed the judgment of the Court of Civil Appeals and rejected Stockstill's claim "that Counts's right to receive a fee was conditioned upon his performing discovery and trial work." 683 So.2d at 969. This Court concluded that the fee agreement unambiguously provided that Counts was to receive 40% of the fee and stated that "[i]f the parties intended to limit Counts's 40% fee, they could have specifically said so in the agreement." 683 So.2d at 970. Moreover, the fee agreement had contemplated the very event  settlement  that Stockstill advanced as the condition he argued should prevent Counts from being entitled to recover under the fee agreement. This Court concluded:
"One cannot reasonably interpret the clear and plain wording of this contract to mean anything except that Counts is entitled to 40% of Stockstill's 1/3 contingent fee on Presley's settlement. Stockstill drafted the fee agreement and now must accept its terms and its results. A different conclusion would run contrary to fundamental contract law."
683 So.2d at 970.
In Gaines, Thomas Benton Barnett, a minor, was killed in a vehicular accident in 1987. 554 So.2d at 445. His father, Robert B. Barnett, Sr., asked another son, Robert Barnett, Jr., a partner in the law firm of Gaines, Gaines & Barnett, P.C., to attempt to negotiate a settlement with the tortfeasor's liability insurer. Those settlement efforts were unsuccessful. 554 So.2d at 446.
Barnett, Sr., then asked his son to contact the law firm of Hare, Wynn, Newell & Newton ("Hare Wynn") to file a wrongful-death action on his behalf. Barnett, Jr., worked out a fee-splitting agreement under which Hare Wynn and the Gaines firm were to share equally a 25% contingency fee. It was understood that Barnett, Jr., would actively work on the case along with Hare Wynn. 554 So.2d at 446.
*449 Approximately two months after the firms entered into the fee-splitting agreement, Barnett, Jr., left the Gaines firm. Soon thereafter, Barnett, Sr., orally and then in writing discharged the Gaines firm and requested an invoice for any expenses the firm had incurred up to that point. Barnett, Sr., then "entered into a formal agreement" with Hare Wynn to represent him. 554 So.2d at 446. The case eventually settled for $1,500,000, and "the Gaines firm filed a motion to enforce a fee agreement and establish an attorney's lien for 12.5%" of the attorney fees. 554 So.2d at 446.
After holding a hearing and receiving ore tenus evidence, the trial court determined that any contingency-fee agreement between Barnett, Sr., and the Gaines firm had been terminated when Barnett, Sr., discharged the firm. Moreover, the trial court found that any agreement between Hare Wynn and the Gaines firm had been "conditioned on the active participation of the Gaines firm in the case, which was not fulfilled, and that discharge of the Gaines firm had the effect of relieving Hare, Wynn of any obligations it had to share the contingent fee with the Gaines firm." 554 So.2d at 446-47. The trial court held that the Gaines firm was entitled to recover only a fee based on quantum meruit, which the court determined was $7,500. 554 So.2d at 447.
The Court of Civil Appeals affirmed. Applying a deferential standard of review under the ore tenus rule, the Court of Civil Appeals could not say that the trial court's ruling was "plainly and palpably wrong or manifestly unjust." 554 So.2d at 447. Although the Gaines firm contended that no credible evidence disputed the essential terms of the fee agreement, the Court of Civil Appeals disagreed. Testimony indicated "that the involvement of the Gaines firm in this case was due solely to the fact that the brother of the deceased was a partner in the Gaines firm." 554 So.2d at 448. Moreover, the Court of Civil Appeals noted:
"The trial court made no finding regarding whether a valid fee division agreement ever existed between the Gaines firm and Hare, Wynn, but, rather, held that `any contingent fee arrangement between Robert B. Barnett, Sr., and the Gaines firm was terminated by Mr. Barnett ... long before the contingency was fulfilled...."
554 So.2d at 448. The Court of Civil Appeals also held that evidence supported the trial court's finding that "any fee division agreement was conditioned on active participation by the Gaines firm" and that the Gaines firm had failed to meet that condition. 554 So.2d at 448.
Finally, the Court of Civil Appeals rejected the Gaines firm's argument that it was entitled to a "referral fee" from Hare Wynn. 554 So.2d at 449. The court reasoned that the Gaines firm's original pleading asserted that the firm had "`associated... the firm of Hare, Wynn ... with the understanding that ... [the Gaines] firm would continue an active role in the case.'" 554 So.2d at 449. The court then concluded, "Clearly, there was no case referral by the Gaines firm to Hare, Wynn." 554 So.2d at 449.
In Gamble, Gamble, an associate at Corley, Moncus & Ward P.C. ("Corley Moncus"), was contacted by Moseley. Moseley was a friend of Gamble and Gamble's family, and he discussed with Gamble the possibility of suing a pharmacy. Gamble later asked the partners of Corley Moncus for permission to sue the pharmacy on Moseley's behalf, but the partners refused because they feared the action would jeopardize the firm's relationship with the Alabama State Board of Pharmacy, a longtime client. 723 So.2d at 628.
*450 Gamble then referred Moseley to the law firm of Heninger, Burge & Vargo ("Heninger Burge"), and Moseley entered a contingency-fee contract with Heninger Burge. The contract provided for Heninger Burge to receive 33 1/3% of any settlement recovery or 40% of any recovery obtained if the case went to trial. An attorney at Heninger Burge then confirmed by letter its arrangement with Corley Moncus. The letter stated, in relevant part:
"`This letter will serve to confirm all agreements that were reached in this case regarding fees. We have Mr. Moseley signed up to a 1/3 if settled or 40% if tried contract. Out of that, we split the fee on a 55/45 basis, with my firm to receive the 55%. Additionally, I understand that you want to remain as active as possible in this file, while at the same time having your name and/or involvement remain anonymous.'"
723 So.2d at 628 (footnote omitted).
For approximately a year thereafter, Gamble actively participated in the case, although his participation was anonymous. But in January 1995, Gamble resigned from Corley Moncus. Gamble explained to Moseley that he was free to file a notice of appearance and to continue Moseley's representation, and Gamble informed Moseley that Corley Moncus could remain involved in the case if Moseley wanted the firm to do so. Moseley, however, decided to terminate his relationship with Corley Moncus, which he did by a letter dated March 11, 1995. 723 So.2d at 629.
In late 1995, Moseley's case settled for $900,000. Heninger Burge received $300,000 from the settlement and paid 45% of that fee ($135,000) to Gamble. Gamble, in turn, sent a check to reimburse Corley Moncus for its expenses on the case and for pay Gamble had received for the hours he had worked on the case as an employee of Corley Moncus. Corley Moncus, however, rejected the reimbursement and sued, asserting rights under Gamble's referral arrangement with Heninger Burge. 723 So.2d at 629. Gamble filed a counterclaim in which he maintained that Corley Moncus was entitled to recovery only under a theory of quantum meruit. In entering a summary judgment for Corley Moncus, the trial court awarded Gamble $20,000, under a theory of quantum meruit, and awarded Corley Moncus $115,000. 723 So.2d at 629-30.
Relying upon Gaines, this Court reversed the trial court's judgment. This Court held that the situation in Gamble "closely resemble[d] the situation in Gaines" and found that "Gamble [had] presented evidence indicating that Corley Moncus's continued (albeit anonymous) participation in the case was a condition precedent to its right to receive a portion of the contingent fee." 723 So.2d at 631. The Gamble Court held that the evidence showed "that Heninger Burge would not have agreed to a 55%/45% split of the contingent fee without Gamble's assurances that he would participate in the case and would share the workload" and that "Gamble's resignation from Corley Moncus prevented Corley Moncus from satisfying the condition requiring its continued participation in the case through Gamble." 723 So.2d at 631.
We agree with Pearson and Prince  the facts of this case are distinguishable from the facts in Counts. Like this case, Counts involved a letter that contained a fee-splitting arrangement between attorneys. 683 So.2d at 969. However, the letter in Counts also addressed the work obligations of the parties, 683 So.2d at 969, while the February 15 letter in this case, with respect to the Moundville gasoline litigation, addressed only the fee-splitting arrangement and required Pearson *451 and Prince to bear responsibility for the expenses of the Moundville gasoline litigation.
Moreover, the fee-splitting letter in Counts specifically acknowledged that settlement negotiations were underway. 683 So.2d at 969. This Court in Counts, however, refused to allow Stockstill  the drafter of the letter and the attorney seeking to avoid splitting the fee  to introduce evidence showing that Counts's entitlement to a percentage of the fee was expressly conditioned upon Counts's performing discovery and trial work. 683 So.2d at 969. This Court explained that "[i]f the parties intended to limit Counts's 40% fee, they could have specifically said so in the agreement." 683 So.2d at 970. Had this Court found otherwise, i.e., had it found that the settlement of the case prevented Counts from satisfying a condition precedent, Stockstill would have been permitted to, in effect, use parol evidence to address settlement, a situation that the parties' written contract addressed. We have already noted, however, that the February 15 letter did not address the situation  that is, the parties' work obligations for the Moundville gasoline litigation  regarding which Pearson and Prince seek to introduce parol evidence to establish the parties' intent.
Finally, Counts is distinguishable from this case because in Counts, the clients on whose cases Counts had been associated did not dispute, or purport to terminate, Counts's representation, and the contingency upon which Counts's recovery was based  that is, settlement of the clients' claim  had occurred before Stockstill asserted his claim that Counts's recovery was subject to an unfulfilled condition precedent. 683 So.2d at 968-69. In this case, however, many of the plaintiffs in the Moundville gasoline litigation objected, in writing and before settlement, to Poole's representation of them, and all of the plaintiffs eventually signed, as part of the settlement, documents that expressly stated that Poole did not represent them.
The facts of this case therefore are more analogous to the facts in Gamble and Gaines. Just as the clients discharged, before settlement, the respective firms that were claiming fees in Gaines, 554 So.2d at 446-47, and in Gamble, 723 So.2d at 629, Poole arguably was discharged by some if not all of the Moundville gasoline litigation plaintiffs before their claims were settled. Moreover, just as the trial court appropriately considered parol evidence in determining and construing the parties' agreement in Gaines, 554 So.2d at 448, and just as this Court in Gamble considered parol evidence in determining that Corley Moncus's recovery was conditioned upon its active participation in the case, 723 So.2d at 631, Pearson and Prince were entitled to introduce parol evidence on the question whether and to what extent Poole had assumed obligations under the overall agreement between the parties. Finally, Poole's contention that all of the cases in the Moundville gasoline litigation were to be "pooled," when coupled with Pearson and Prince's assertions that Poole had assumed obligations to work on the Moundville gasoline litigation, creates a question of fact  which should be determined by the trier of fact  as to whether the parties' intended for their agreement to be a referral arrangement or an association arrangement.[19] If indeed the parties intended an association arrangement rather than a referral arrangement, then this case would be even more analogous to Gaines. 554 So.2d at 449 ("Clearly, there was no case *452 referral by the Gaines firm to Hare, Wynn.").[20]
This case, however, is not completely analogous to Gamble and Gaines. In addition to whether the parties intended for their arrangement to be a referral or an association, there are disputed issues of fact in this case with respect to: (1) whether Poole assumed obligations under the overall agreement among the parties and, if so, what those obligations were; and (2) if Poole indeed assumed obligations under the parties' agreement, whether the parties intended Poole's performance of those obligations to be a condition precedent to his entitlement to a percentage of the fees obtained in the Moundville gasoline litigation.

II.
Prince contends finally that the trial court erred in striking portions of his affidavit submitted in opposition to Poole's motion for a summary judgment. The trial court did not explain the basis for its ruling other than to state that "[a]fter consideration of the relevant legal authorities, the parties' written submissions, and the parties' oral arguments" the court would "disregard the parts of Prince's [affidavit] testimony identified in Poole's Motion to Strike."
It is well settled that "`a party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment.'" Wilson v. Teng, 786 So.2d 485, 497 (Ala.2000) (quoting Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 317 (Ala.1992)). The basis for this rule is to prevent the introduction of a sham affidavit into judicial proceedings. Tittle v. Alabama Power Co., 570 So.2d 601, 604 (Ala.1990). Thus,
"`"[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."' [Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 317 (Ala. 1992)], quoting Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961 (Ala.1987). However, when a party submits a subsequent affidavit merely to clarify his or her answers to ambiguous questions asked by counsel during a deposition or other prior sworn proceeding or to supply information not necessarily sought by questions asked at the deposition or other prior sworn proceeding, the trial court should consider the subsequent affidavit. See, e.g. Rickard v. Shoals Distrib., Inc., 645 So.2d 1378, 1382-83 (Ala. 1994); and Tittle v. Alabama Power Co., 570 So.2d 601, 606-07 (Ala.1990)."
Wilson, 786 So.2d at 497.
Poole's motion to strike identified portions of Prince's affidavit that Poole contended contradicted Prince's prior sworn testimony. Among other objections,[21] Poole challenged Prince's affidavit *453 testimony that Poole had assumed obligations not stated in the February 15 letter and that he did not perform those obligations. Poole argued that this portion of Prince's affidavit contradicted Prince's earlier deposition testimony that he could "not point to anything in the [February 15 letter] that Poole was supposed to do ... that . . . he did not do," that "there is nothing in [the February 15 letter] that Poole violated," and that Poole "was not going to be active in working up the cases." The trial court apparently agreed with Poole's analysis.
The trial court erred in granting Poole's motion to strike these portions of Prince's affidavit.[22] When the portions of Prince's deposition quoted by Poole above are placed in context and viewed in light of Prince's theory of the case, it is apparent that Prince's affidavit testimony regarding Poole's obligations under the February 15 letter does not "merely contradict[], without explanation, previously given clear testimony" by Prince. Wilson, 786 So.2d at 497. Prince's deposition testimony that he could "not point to anything in the [February 15 letter] that Poole was supposed to do ... that ... he did not do" and that "there is nothing in [the February 15 letter] that Poole violated," when placed in context, was as follows:
"Q. . . . My question was, is there anything in that February 15, 2000 letter agreement . . . that Phil is required to do by the terms of that agreement that you claim he failed to do?
"A. Just by the written words on the letter, no, he did not  there's nothing in there that he violated.
"....
"Q. But sitting here today and having [the February 15 letter] in front of you, you cannot point to anything in [the February 15 letter] that Phil was supposed to do that you say he did not do?
"A. That's correct."
(Emphasis added.) Given that Prince and Pearson have consistently maintained that the February 15 letter is not the parties' complete agreement regarding the Moundville gasoline litigation, this deposition testimony by Prince does not conflict with his testimony in his affidavit that
"Poole was expected to refer new cases relating to the Moundville gasoline spill, assist with state agencies, and be available to assist with the jury selection and at trial. Poole did not do any work *454 on the cases, of which I am aware, after this letter was written."
Likewise, Prince's affidavit testimony that Poole had assumed obligations not mentioned in the February 15 letter did not contradict Prince's deposition testimony that Poole "was not going to be active in working up the cases." Prince concedes that he knew Poole had virtually no experience as a trial lawyer and therefore would not have been expected to be "active in working up the cases."[23] But, Prince contends, Poole's lack of experience in civil litigation does not mean that Poole did not also have the obligations to which Prince and Pearson testified, such as assisting with state agencies and being available for jury selection and for trial. Those obligationsrather than requiring that Poole have an extensive background in civil litigationrelied instead upon Poole's familiarity with Montgomery and with the residents of Moundville.
Indeed, the February 15 letter is silent regarding the parties' obligations with respect to working on the Moundville gasoline litigation. Thus, instead of striking Prince's affidavit testimony regarding Poole's obligations to work on the Moundville gasoline litigation, the trial court should have viewed it as an attempt by Prince "merely to clarify his . . . answers to ambiguous questions asked by counsel during a deposition . . . or to supply information not necessarily sought by questions asked at the deposition." Wilson, 786 So.2d at 497 (citations omitted).

Conclusion
For the foregoing reasons, the summary judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
NABERS, C.J., and LYONS, WOODALL, and BOLIN, JJ., concur.
PARKER, J., concurs in the result.
HARWOOD, J., recuses himself.
HARWOOD, Justice (statement of recusal).
I recuse myself. When the underlying action was filed in the Tuscaloosa Circuit Court on May 12, 2000, I was one of the six circuit judges of that judicial circuit. On May 31, 2000, our presiding circuit judge advised the Chief Justice of the Alabama Supreme Court that all six circuit judges had recused themselves in the case because "[b]oth parties are local law firms whose members regularly practice in this circuit." Having recused myself at the trial court level, I consider myself obliged to recuse myself at the appellate court level.
NOTES
[1] This case was originally assigned to another Justice; it was reassigned to Justice Smith.
[2] Prince was an equity partner in Prince, Poole & Cross, P.C. Just before January 2000, the firm changed its name to Prince, Poole, Cross & Fischer, P.C. Following the departure of Poole, Cross, and Fischer in January 2000, the firm changed its name to The Prince Law Firm, P.C.
[3] As a name partner, Poole had no ownership interest in the firm and was not responsible for any of the firm's expenses.
[4] Although Prince disagreed, Poole deemed a client as "procured" or referred by him if: (1) he signed a client on a contingency-fee contract; (2) he referred a prospective client to Prince, Poole & Cross, P.C.; or (3) a former Poole-procured or Poole-referred client referred another client to the firm.
[5] Poole's brief, pp. 25-26 ("The purpose of the oral agreement was to `share' or `pool' all of the cases in a joint effort as between Prince, Pearson and Poole.... All of the cases were `pooled' and, with regard to the eventual distribution of fees, it made no difference which lawyer signed up the cases....").
[6] Under both interpretations of the July 1996 agreement, James Seale, an attorney who is not a party to this appeal, was to receive 10% of the fees from the Moundville gasoline litigation. Thus, under Poole's interpretation of the July 1996 agreement, Poole, Pearson, and Prince would have split equally the remaining 90%.
[7] Poole did not sign the exit agreement, and he testified that that agreement was "none of [his] business." He further claims that he was not a party to any of the alleged oral agreements between Cross, Fischer, and Prince. In his answer and counterclaim in the declaratory-judgment action filed by Prince, however, Poole asserted a right to an accounting under the exit agreement. Presumably, Poole asserted that right under paragraph 3 of the exit agreement, which states:

"Both the Original Firm and the Departing Firm shall have a unilateral right to inspect all books, records, case files, documents, or other records of any kind which are reasonably necessary to conduct an accurate accounting as to said cases enumerated in Exhibits A, B and C at any time upon reasonable notice."
The exit agreement defined the "Original Firm" as "Prince, Poole, Cross & Fischer, P.C. and/or its successor firm and/or Robert F. Prince, individually" and the "Departing Firm" as "Cross, Poole & Fischer, L.L.C., Silas G. Cross, Jr., individually and Erby J. Fischer, individually."
[8] The exit agreement referred to the Moundville gasoline litigation as the "Chevron Cases."
[9] See supra note 2.
[10] The parties dispute whether Jenkins was acting on behalf of Poole in writing the August 4 letter. Because the subject line of the August 4 letter references only "Silas G. Cross, Jr. and Erby Fischer," Pearson claims that Jenkins was not acting on Poole's behalf. Moreover, the August 4 letter indicates that copies were sent to Fischer and Cross, but Poole is not listed as a recipient of a copy of the August 4 letter. Pearson concludes that Jenkins was not acting on Poole's behalf in the August 4 letter, and, Pearson argues, Poole therefore failed for more than a year to raise an objection to Pearson's alleged termination of Poole in the July 5 letter.

Poole responds to Pearson's claims by pointing out that Jenkins had already filed the answer and counterclaims on behalf of Cross, Poole, and Fischer in Prince's declaratory-judgment action.
Because we conclude that there are other factual disputes of a material nature that render a summary judgment inappropriate in this case, we pretermit discussion of the materiality of the factual dispute concerning whether Jenkins was acting on Poole's behalf in sending the August 4 letter.
[11] Poole testified that he filed at least one unauthorized notice of appearance on behalf of a plaintiff in the Moundville gasoline litigation. Poole stated that he "believe[d] [his] attorneys" had "mistakenly" filed that notice of appearance.
[12] Four of the notarized letters were identical; they stated:

"Dear Mr. Poole:
"I am writing this letter and requesting that you destroy the document you had me sign on October 14, 2002. I am further informing you and anyone else that Ward Pearson and Bob Prince only are my legal counsel in any and all situations dealing with Plantation Pipe Line Company, Chevron and CH2M Hill.
"To the extent there is any claim that Phil Poole ever represented me in any aspect of these cases, I terminate this representation."
The fifth letter stated:
"Dear Mr. Poole:
"I am writing this letter and requesting that you destroy the document you had me sign on October 14, 2002, which allowed you to enter an appearance in my case. If you have filed an appearance please cancel it."
[13] The Prince-Patterson Law Firm, P.C., appears to have been a successor firm to The Prince Law Firm.
[14] Because discussion of those two issues results in the reversal of the summary judgment, we pretermit discussion of Pearson's and Prince's remaining issues challenging the summary judgment.
[15] See, e.g., Ronnie Smith's Home Ctr., Inc. v. Luster, 845 So.2d 764, 764 n. 1 (Ala.2002) (Harwood, J., concurring specially) (merger clause stated: "`This contract is the entire agreement between us and I agree that no oral or implied representations have been made to induce me to enter into this Contract' and `THIS CONTRACT SETS FORTH OUR ENTIRE AGREEMENT AND ... NO OTHER PROMISES HAVE BEEN MADE.'" (capitalization in original)); Ex parte Palm Harbor Homes, Inc., 798 So.2d 656, 658 (Ala.2001) (merger clause stated: "`This written Contract is the only agreement that covers my purchase of the property.'"); Gardner v. State Farm Mut. Auto. Ins. Co., 822 So.2d 1201, 1208 (Ala.Civ.App.2001) (merger clause stated: "This agreement shall supersede all prior agreements between the several parties hereto, whether written or otherwise, provided that the provisions in prior agreements establishing the amount and method of repayment by the Agent to the Companies for financing deficits incurred under prior agreements shall remain in force until such deficits are repaid in full.").
[16] The February 15 letter does address the obligations of the parties with respect to the Gordo aquifer class action. Part III of the February 15 letter states that "any group so participating [in the Gordo aquifer class action] shall be obligated for their proportionate share of the workload associated with the prosecution of the litigation." We think this supports our conclusion that the parties did not intend for the February 15 letter to serve as their complete agreement regarding the Moundville gasoline litigation.
[17] Pearson testified in his deposition and affidavit as to those obligations. Prince's contentions in this regard occur in the portions of his affidavit the trial court struck. In our analysis we conclude that the trial court erred in striking those portions of Prince's affidavit in which he claimed Poole had assumed and had failed to perform obligations not found in the text of the February 15 letter.
[18] Moreover, Pearson and Prince argue that Poole's interpretation of his obligations under the February 15 letter presents potential public-policy concerns. Considering the disputed facts in favor of Pearson and Prince, the non-movants, as we must, Poole secured or referred only 8 of the 22 cases representing the Moundville gasoline litigation. If we were to conclude that, as Poole contends, Poole was not obligated to do anything other than place a case involving the Moundville gasoline litigation into the "pool" of cases if a claim came his way, Pearson and Prince argue that the February 15 letter would violate Rule 1.5(e), Ala. R. Prof. Conduct.

Rule 1.5(e) addresses the division of a fee between lawyers who are not in the same firm. The rule provides:
"(e) A division of fee between lawyers who are not in the same firm, including a division of fees with a referring lawyer, may be made only if:
"(1) either (a) the division is in proportion to the services performed by each lawyer, or (b) by written agreement with the client, each lawyer assumes joint responsibility for the representation, or (c) in a contingency fee case, the division is between the referring or forwarding lawyer and the receiving lawyer;
"(2) the client is advised of and does not object to the participation of all the lawyers involved;
"(3) the client is advised that a division of fee will occur; and
"(4) the total fee is not clearly excessive."
Consistent with his position that the February 15 letter is an unambiguous, integrated agreement, Poole contends that accepting Pearson and Prince's argument "would be strange indeed" because, he argues, it would "allow[] the draftsman of a fee splitting agreement to enjoy all of the benefits of that agreement, only to much later turn around and attempt to enrich himself by denying those benefits to another party." (Poole's brief, p. 62 (footnote omitted).) However, Pearson and Prince point out that when the February 15 letter is viewed as only a part of the parties' overall agreement, the February 15 letter did not violate Rule 1.5(e) because, they argue, Poole agreed to work on the Moundville gasoline litigation, including, presumably, those cases he neither secured nor referred.
We point out this dispute only to emphasize that there are other potential problems with Poole's interpretation of the February 15 letter as a complete integration of the parties' agreement. However, in light of our disposition of this case in favor of Pearson and Prince, we find it unnecessary to resolve the parties' dispute over the applicability of Rule 1.5(e), Ala. R. Prof. Conduct.
[19] Pearson's deposition testimony and his July 5 letter indicate that he viewed the February 15 letter as creating an association arrangement rather than a referral arrangement.
[20] We are not the appropriate decisionmaker to resolve this disputed material fact. As we discuss, see infra, the procedural posture of Gaines was different from that of this case. In Gaines, the Court of Civil Appeals determined that evidence supported the trial court's conclusion, based upon ore tenus evidence, that the arrangement was an association rather than a referral and that "any agreement between the Gaines firm and Hare, Wynn was conditioned on active participation by the Gaines firm." 554 So.2d at 449.
[21] Because we hold that the trial court erred in striking those portions of Prince's affidavit in which Prince asserted that Poole had assumed obligations other than what is stated in the February 15 letter, we pretermit discussion of any other issues related to the trial court's ruling on Poole's motion to strike.
[22] In his brief, Poole argues that we should apply a more deferential standard in reviewing the trial court's ruling on Poole's motion to strike Prince's affidavit. (Poole's brief, p. 38.) Poole explains that in reviewing a trial court's ruling on a motion to strike a complaint, this Court has applied the de novo standard of review, see, e.g., Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d 1013, 1017 (Ala.2002), but Poole points out that usually rulings on evidentiary submissions, consistent with a trial court's role as a discretionary "gatekeeper," are reviewed under a more deferential standard, see, e.g., Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala.2001) ("When evidentiary rulings of the trial court are reviewed on appeal, `rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion.'") (quoting Bama's Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998), additional citation omitted). See also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus., 328 F.3d 309, 318 (7th Cir.2003) (noting that "[a] district court's refusal to strike or disregard portions of an affidavit in a motion for summary judgment [under Rule 56, Fed.R.Civ.P.] is reviewed for an abuse of discretion").

We need not determine which standard is appropriate in this case, however, because even under the more deferential standard of review, it was error for the trial court to strike those portions of Prince's affidavit in which he asserted that Poole had assumed obligations other than what appears in the language of the February 15 letter.
[23] Poole testified at his deposition that he had never (1) taken a deposition; (2) tried to settle a jury case; (3) cross-examined an expert in the courtroom; (4) conducted the direct examination of an expert; (5) handled a witness interview; (6) taken a civil case through trial; (7) conducted voir dire in a civil jury case; or (8) struck a jury in a civil case.