596 So.2d 119 (1992)
SUNCHASE APARTMENTS, a Wisconsin general partnership, and Jeffrey Keierleber, as general partner of Sunchase Apartments, Appellants,
v.
SUNBELT SERVICE CORPORATION, a Texas corporation, Appellee.
No. 91-598.
District Court of Appeal of Florida, First District.
March 16, 1992.
*120 William G. Cooper of Coker, Myers, Schickel, Cooper & Sorenson, P.A., Jacksonville, for appellants.
Douglas R. Bald of Fergeson, Skipper, Shaw, Keyser, Baron & Tirabassi, P.A., Sarasota, for appellee.
WEBSTER, Judge.
Appellants, defendants below, seek review of a summary final judgment entered in a mortgage foreclosure action. In addition to ruling in appellee's favor on the foreclosure claim, the trial court ruled in favor of appellee on appellants' amended counterclaim, which sought damages or, in the alternative, "recision, reformation and/or cancellation of the closing documents," because of alleged fraudulent misrepresentations. The sole argument presented by appellants is that it was error to enter a summary final judgment because there existed genuine issues as to material facts.[1] Concluding that the decision of the trial court was correct, we affirm.
In June 1989, appellee filed its initial complaint which, among other things, sought to foreclose a mortgage on real property on which was situate an apartment complex. An amended complaint, also seeking foreclosure, was filed in November 1989. In March 1990, appellants filed an answer, affirmative defenses and a counterclaim; and, in July 1990, after appellee had filed an answer and affirmative defenses to the counterclaim, appellants sought and obtained leave to file an amended counterclaim.
*121 Appellants' answer to the amended complaint denies all of the material allegations contained in the amended complaint. In addition, appellants asserted four affirmative defenses (estoppel, waiver, fraudulent misrepresentations and failure of consideration), all of which are based upon oral representations allegedly made by employees of appellee at the time that the relevant documents were signed. The amended counterclaim is in two counts. Count One seeks damages for fraudulent misrepresentations allegedly made orally by employees of appellee to induce appellants to purchase the apartment complex, and to assume the mortgage. Count Two seeks "recision, reformation and/or cancellation of the closing documents," based upon the same alleged oral fraudulent misrepresentations.
Appellee answered the amended counterclaim, denying all of its material allegations. Appellee also asserted five affirmative defenses, only two of which are relevant to this appeal. Appellee asserted that the claims made in the amended counterclaim were barred because the mortgage and mortgage modification agreement expressly prohibited any waiver or modification of their terms except by a written document signed by appellee. However, appellee also asserted, as its First Affirmative Defense, the following:
[Appellee] is a wholly-owned subsidiary of Sunbelt Savings, FSB. Sunbelt Savings, FSB, is a federal savings bank operating under the supervision of the Federal Assistance Division of the Federal Deposit Insurance Corporation. Pursuant to the holdings in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 [62 S.Ct. 676, 86 L.Ed. 956] (1942) and its progeny, borrowers from federally insured and regulated institutions and their subsidiaries are barred from maintaining claims or defenses based upon unrecorded agreements and representations. Therefore, [appellants'] [c]ounterclaim, which is predicated upon purported unrecorded agreements and representations, is expressly barred by the applicable federal and Florida case law.
(Appellee also filed a substantively identical reply to all of appellants' affirmative defenses.)
On August 24, 1990, appellee filed its "Second Renewed Motion for Partial Summary Judgment." (Appellee had filed similar motions on two prior occasions. However, on the first occasion the hearing was cancelled because appellants had claimed that they had received insufficient notice, and because they had not yet answered the amended complaint; and, on the second occasion, approximately ten days after appellee had filed its motion, appellants sought and obtained leave to amend their counterclaim.) With regard to the affirmative defenses and counterclaim of appellants, the "Second Renewed Motion" adopted the following from the previous motion, as the first ground entitling appellee to summary judgment:
The [a]ffirmative [d]efenses and [c]ounterclaim are predicated upon alleged oral promises, representations or agreements which, pursuant to the holding of the United States Supreme Court in D'Oench and Dhume [sic] Co., Inc. v. Federal Deposit Insurance Corp., 315 U.S. 447 [62 S.Ct. 676, 86 L.Ed. 956] (1942) and its progeny, cannot be used as grounds for either defenses or claims against wholly-owned subsidiaries of federally-insured savings institutions. The Affidavit in Support of Motion for Partial Summary Judgment of Elizabeth Smith establishes that [appellee] is a federally-insured savings institution. Therefore, the [a]ffirmative [d]efenses and [c]ounterclaim of [appellants] alleging fraud, waiver, estoppel and failure of consideration based upon non-written promises, representations or agreements, are barred by the D'Oench doctrine.
A hearing was held on the "Second Renewed Motion" on September 13, 1990. After the hearing, at the request of the trial court, the parties filed legal memoranda. In its memorandum, appellee argued at some length that what has come to be known as the "D'Oench doctrine" [after D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)], barred assertion by appellants of all of *122 their affirmative defenses and their counterclaim, citing a number of cases in support of its argument. Appellants did not address the issue in their memorandum.
On December 5, 1990, the trial court entered its summary final judgment. Paragraph 2 of the judgment reads as follows:
[Appellants'] [a]ffirmative [d]efenses and [c]ounterclaim, which are based upon alleged oral representations and agreements which were made prior to or contemporaneously with the execution of the [m]ortgage [m]odification [a]greement and the [r]eplacement [p]romissory [n]ote, are barred by the express provisions of the [m]ortgage documents and the applicable Florida law.
Appellants' motion for rehearing was denied, and this appeal followed.
We recognize that, as a general matter, claims in which fraud is an issue should not be resolved by summary judgment. Barrios v. Duran, 496 So.2d 239 (Fla.3d DCA 1986). We also recognize that the existence of a "merger clause" (i.e., a clause which states that all oral representations or agreements are merged into and subsumed by the written document of which the clause is a part) may not be asserted to bar evidence regarding alleged oral representations or agreements offered to prove that the document containing the "merger clause" was procured by fraud. Nobles v. Citizens Mortgage Corp., 479 So.2d 822 (Fla. 2d DCA 1985). However, we also recognize the rule, applicable to summary judgments as well as to other orders and judgments, that an appellate court must affirm the trial court's decision if it is supported by any theory, regardless of the reasons stated in the order or judgment. Landis v. Allstate Ins. Co., 546 So.2d 1051 (Fla. 1989); Green v. First American Bank and Trust, 511 So.2d 569 (Fla. 4th DCA 1987), review denied, 520 So.2d 584 (Fla. 1988).
We agree with appellants that the trial court incorrectly concluded that appellants' affirmative defenses and counterclaim "are barred by the express provisions of the [m]ortgage documents and the applicable Florida law." (By "the applicable Florida law," we assume that the trial court meant Florida law addressing the legal effect of "the express provisions of the [m]ortgage documents"; i.e., the law relating to "merger clauses," the parol evidence rule, etc.) Nevertheless, we affirm the trial court's decision because our review of the entire record convinces us that there exists no genuine issue of fact material to a finding that the D'Oench doctrine applies; that, based upon the undisputed facts, the D'Oench doctrine does apply; and that, as a matter of law, the D'Oench doctrine bars assertion by appellants of either their affirmative defenses or their counterclaim, thereby entitling appellee to a summary final judgment in its favor.
In D'Oench, the Federal Deposit Insurance Corporation (FDIC) had filed suit against D'Oench, Duhme & Co. (which was engaged in the securities business) to collect on a demand note executed by D'Oench several years earlier, and made payable to the Belleville Bank & Trust Co. (The FDIC had acquired the note as a part of the collateral securing a substantial loan made by the FDIC in connection with the assumption by another financial institution of the Bank's deposit liabilities.) The note (which had been among the Bank's charged-off assets for some time) was part of a scheme by the Bank to avoid having to treat as past-due assets certain bonds sold by D'Oench to the Bank, which bonds had become almost worthless. In response to the suit, D'Oench raised as defenses lack of consideration, that the note had been executed with the understanding that no suit would ever be brought to collect on it and that the FDIC was not a holder in due course. The defenses were all based upon a receipt for the note from the Bank, produced by D'Oench, which stated, "`This note is given with the understanding it will not be called for payment.'" 315 U.S. at 454, 62 S.Ct. at 678, 86 L.Ed. at 960. In its reply, the FDIC asserted that D'Oench was estopped to raise those defenses because there was no indication anywhere in the Bank's records that the note was not valid and enforceable and, therefore, to allow such defenses would permit creditors of *123 the Bank, state banking authorities and the FDIC to be deceived regarding the Bank's financial condition. The trial court concluded that D'Oench was estopped to assert the defenses raised and that the FDIC was an innocent holder of the note in good faith and for value; and, therefore, that the FDIC was entitled to recover on the note.
On appeal, the Supreme Court declared that a federal policy existed to protect the FDIC against misrepresentations as to the assets and liabilities in the portfolios of the banks which it insured, or to which it made loans. Because of the importance of that policy, the Court held that, as a matter of federal common law, D'Oench could not rely upon the agreement not to attempt to collect on the note, which was not reflected in the Bank's records, to defeat recovery by the FDIC. It held, further, that fraudulent intent was not necessary in order to trigger the common-law rule, and that the fact that creditors (including state banking regulators and the FDIC) were not deceived was irrelevant; "it is the `evil tendency' of the acts to contravene the policy governing banking transactions which lies at the root of the rule." 315 U.S. at 459, 62 S.Ct. at 680, 86 L.Ed. at 963.
The rule announced in D'Oench was later codified by the Federal Deposit Insurance Act of 1950, § 2[13](e), 64 Stat. 889, as amended, 12 U.S.C. § 1823(e), as follows:
No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement 
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.
Recently, in the course of concluding that even claims or defenses of fraud in the inducement are barred by Section 1823(e), the Supreme Court said the following about that Section:
One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities . .., and when the FDIC is deciding whether to liquidate a failed bank, ... or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank... . The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." ... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.
Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340, 347 (1987).
Notwithstanding Section 1823(e), the federal common-law rule which is now known as the D'Oench doctrine continues alive and well. FDIC v. Hoover-Morris Enterprises, 642 F.2d 785 (5th Cir.1981). In fact, it has been held that "the D'Oench doctrine has broader application than § 1823." Hall v. FDIC, 920 F.2d 334, 339 (6th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). "The rule emerging from D'Oench, Duhme is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC." Adams v. Madison Realty & Development, Inc., 937 F.2d 845, 852 (3d Cir.1991). "[T]he rationale behind D'Oench *124 has been extended far beyond the factual setting in D'Oench itself, and now applies to virtually all cases where a federal depository institution regulatory agency [including, in addition to the FDIC, the Federal Savings and Loan Insurance Corporation (FSLIC) and the Resolution Trust Corporation (RTC)] is confronted with an agreement not documented in the institution's records." Baumann v. Savers Federal Savings & Loan Assoc., 934 F.2d 1506, 1510 (11th Cir.1991). It makes no difference whether the issue is presented in the form of a claim or of a defense; as long as the claim or defense is based upon an alleged agreement the terms of which are not contained within the four corners of the written obligation or found in the official records of the financial institution, the claim or defense is barred. See, e.g., Langley v. FDIC, supra (defense of fraud in the inducement); Victor Hotel Corp. v. FCA Mortgage Corp., 928 F.2d 1077 (11th Cir.1991) (claims of breach of contract, restitution and fraudulent inducement).
The D'Oench doctrine has been applied even when the "side" or "secret" agreement relied upon was between the obligor and a third party, rather than between the obligor and the financial institution. See, e.g., FDIC v. Hoover-Morris Enterprises, supra (D'Oench doctrine applies to bar defense based upon alleged oral accord and satisfaction regarding note executed by defendant in favor of third party, an interest in which was subsequently conveyed to insured institution). Moreover, it is clear that the protections afforded by the D'Oench doctrine extend to those who subsequently receive an asset from the federal regulatory agency. See FSLIC v. Griffin, 935 F.2d 691 (5th Cir.1991) ("D'Oench Duhme can be applied for the benefit of an assignee or a transferee/purchaser from FDIC or FSLIC"); Victor Hotel Corp. v. FCA Mortgage Corp., supra (D'Oench doctrine's protection extends to a subsidiary of a federally-insured financial institution); FSLIC v. Cribbs, 918 F.2d 557 (5th Cir.1990) (a bank assigned a note and guaranty by FSLIC, as receiver for a failed savings and loan association, is entitled to the same D'Oench doctrine protection as is FSLIC); Porras v. Petroplex Savings Association, 903 F.2d 379 (5th Cir.1990) ("[c]laims and defenses barred as to the FSLIC by the D'Oench, Duhme doctrine are similarly barred as to private parties who purchase the assets of the failed institution from the FSLIC").
The apartment complex which is the subject of this action had previously been purchased by a third party, DRW Property Co. 74 (DRW), with funds borrowed from appellee. In 1985, after DRW had defaulted on its obligations to appellee, appellants and DRW entered into a contract, pursuant to which appellants agreed to acquire the apartment complex from DRW. However, the contract was conditioned upon appellants being able to negotiate a satisfactory agreement with appellee regarding the outstanding indebtedness. The gravamen of appellants' counterclaim and affirmative defenses is as follows:
During the negotiations [between appellants and appellee], it was evident ... that [the apartments] were (a) in a seriously physically deteriorated state, (b) had a low occupancy rate, (c) had a low class of tenants, (d) had substantial delinquencies in rent payments by tenants, (e) had suffered serious damage through tenant abuse and general depreciation, and (f) needed substantial capital improvements which were estimated by all parties to cost approximately $500,000.00.
It was also evident ... that the property had not generated and did not and could not generate sufficient income to pay operating expenses and debt service. Accordingly, all parties ... knew that the property could not generate sufficient income to pay for the capital improvements necessary to upgrade the apartment complex and allow it to attract more tenants and a higher class of tenants.
In recognition of the foregoing facts, [appellants] advised [appellee] that [appellants] would only purchase the property from DRW if [appellee] would agree to either reduce the principal amount of its loan or the interest rate or both so as *125 to make it possible for the property to generate a positive cashflow.
[Appellee] advised [appellants] that for certain administrative reasons resulting from the substantial defaults by DRW, [appellee] could not reduce prior to closing the amount of principal or the interest rate to the amount necessary for the property to break even or generate a positive cashflow. However, [appellee] affirmatively represented to [appellants] that if [appellants] would (a) purchase the property from DRW, (b) make the capital improvements necessary to upgrade the property, and (c) keep the loan current for at least four months following acquisition, [appellee] would (i) presently modify the existing loan by forgiving certain past-due interest, modifying the interest rate and terms to the extent possible prior to [appellants'] completion of the conditions described above, and (ii) thereafter, reduce the principal amount of the loan or the interest rate or both so as to permit the apartment project to at least break even based upon the operating results of the improved apartment complex under [appellants'] ownership and management.
[Appellee] specifically represented to [appellants] that [appellee] did not want to (a) take title to the property through foreclosure or otherwise from DRW, (b) invest in the property the sums necessary to perform deferred maintenance and upgrade the property, or (c) maintain a debt structure on the property after its acquisition and improvement by [appellants] which could not be paid from the income generated by the property.
[Appellee] affirmatively represented to [appellants] that as soon as [appellants] completed the renovation and had established an approximate four-month history of maintaining its loan ... in a current and paid status, [appellee] would modify the loan by either reducing the principal balance so as to allow [appellants] to refinance the loan or reduce the interest rate to a rate sufficient to permit the property to at least break even.
According to appellants, acting "[i]n reasonable reliance on the ... representations of [appellee]," appellants purchased the property from DRW; and executed and delivered to appellee a mortgage modification agreement and a replacement note. However, after appellants had made the necessary capital improvements to the apartment complex and had kept the loan current for some time, appellee "refused to respond to requests by [appellants] to enter into good faith negotiations to reduce the principal amount of the loan or the interest rate, or both ... consistent with the representations made by [appellee] prior to [appellants'] acquisition of the property." Appellants concede that the representations allegedly made to them by employees of appellee were oral; and that neither the mortgage modification agreement nor the replacement note contains any language suggesting that the agreement between the parties includes any such terms.
The affidavit of one of the appellee's vice-presidents (which affidavit is uncontroverted) establishes the following: In December 1985, appellants executed the mortgage modification agreement and the replacement note; and the apartment complex was conveyed to appellants by DRW. Prior to August 19, 1988, appellee had been a wholly-owned subsidiary of Sunbelt Savings Association of Texas, a state-chartered savings and loan association the accounts of which were insured by FSLIC. On August 19, 1988, Sunbelt Savings Association was declared insolvent and placed under the receivership of FSLIC. On the same day, the Federal Home Loan Bank Board created Sunbelt Savings, FSB, a federal savings bank. Also on the same day, FSLIC, as receiver, and the newly-created Sunbelt Savings entered into an Acquisition Agreement (a copy of which is attached to the affidavit); and the Federal Home Loan Bank Board approved the Acquisition Agreement. Pursuant to the Acquisition Agreement, all of the stock of appellee was transferred to the new Sunbelt Savings, making appellee a wholly-owned subsidiary of the new Sunbelt Savings, a status which still existed on the date of the affidavit. As of the date of the affidavit, the new Sunbelt Savings was a federally-insured *126 savings institution, operating under the supervision of the Federal Assistance Branch of the FDIC.[2]
The affidavit establishes, further, that there are no documents in appellee's records reflecting any agreement between appellee and appellants other than as set forth in the mortgage modification agreement and the replacement note. "Specifically, there are no documents or writings contained in the records of [appellee] reflecting an agreement, promise or representation by [appellee] to reduce either the principal amount of the [replacement note] or the interest rate on the [replacement note] at any time under any conditions."
We conclude, based upon the foregoing undisputed facts, that this is a clear case for application of the D'Oench doctrine. The material facts of this action are substantively indistinguishable from those in Victor Hotel Corp. v. FCA Mortgage Corp., supra, and Porras v. Petroplex Savings Association, supra. In particular, in Victor Hotel Corp. v. FCA Mortgage Corp., the court held that a wholly-owned subsidiary of a newly-created federal savings and loan which had received notes and mortgages pursuant to an Acquisition Agreement was entitled to assert the D'Oench doctrine as a defense to the obligor's claims alleging breach of contract, restitution and fraudulent inducement.[3]
There can be no question but that appellee properly raised the D'Oench doctrine as a bar both to appellants' affirmative defenses and to appellants' counterclaim. Because there is no dispute as to any fact material to the issue of whether or not the D'Oench doctrine is applicable, appellee is entitled, as a matter of law, to a determination that it does apply. Because appellants' counterclaim is barred by the D'Oench doctrine, appellee is entitled to a judgment in its favor on the counterclaim. Once it is determined that appellants' affirmative defenses are also barred by the D'Oench doctrine, there remains no genuine issue as to any fact material to appellee's foreclosure claim. Accordingly, appellee is, likewise, entitled to a judgment in its favor on the foreclosure claim.
Based upon the foregoing analysis, we conclude that the trial court did not err in entering the summary final judgment which is the subject of this appeal. Therefore, the summary final judgment is affirmed.
AFFIRMED.
SHIVERS and ZEHMER, JJ., concur.
NOTES
[1] Although the summary final judgment, which adjudicated both appellee's foreclosure claim and appellants' amended counterclaim, was entered in response to a motion filed by appellee seeking a partial summary judgment as to the foreclosure claim only, appellants do not challenge the judgment on this ground. Likewise, although appellants had argued in their motion for rehearing that the judgment had been entered before discovery had been completed, they do not raise this argument as a basis for reversal.
[2] Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989), FSLIC was abolished as of August 9, 1989; and the FDIC was named the successor in interest to many of FSLIC's rights and responsibilities.
[3] We note that, in FSLIC v. T.F. Stone-Liberty Land Associates, 787 S.W.2d 475 (Tex. Ct. App. 1990), the court reversed an $18 million judgment which had been entered against appellee and its parent, Sunbelt Savings Association of Texas. The judgment had been entered after a trial in which borrowers had claimed that appellee had breached various agreements, fraudulently induced the borrowers to enter into the agreements, wrongfully foreclosed, breached its fiduciary duty and been guilty of usury. The court concluded that appellee, as well as FSLIC (as receiver for Sunbelt Savings Association of Texas), was entitled to rely upon the D'Oench doctrine as a defense; and that, to the extent that the borrowers' claims were based upon agreements not reflected in appellee's records, those claims were barred.