629 So.2d 157 (1993)
FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, Appellant,
v.
DIAMOND C NURSERIES, INC., Appellee.
No. 92-1742.
District Court of Appeal of Florida, Fourth District.
August 25, 1993.
Rehearing and Rehearing Denied December 15, 1993.
*158 Alan J. Briggs and Suzanne H. Youmans of Squire, Sanders & Dempsey, Palm Beach, for appellant.
Gregory C. Picken, West Palm Beach, for appellee.
Rehearing and Rehearing En Banc Denied December 15, 1993.
KLEIN, Judge.
The trial court concluded that an unrecorded satisfaction of a mortgage securing a loan from a bank taken over by the FDIC barred foreclosure. We conclude that the satisfaction was not sufficiently documented in the bank's records to comply with D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), or 12 U.S.C. § 1823(e), and reverse.
In 1986 Thomas S. Waldron, who controlled the appellee, Diamond C Nurseries, Inc., agreed to put up a 53 acre nursery in Palm Beach County owned by Diamond C as collateral for loans made by Republic Bank for Savings, F.A., of Jackson, Mississippi. This mortgage was to secure loans to Waldron's friends or business associates, William Lack and Charles Buckner, who had previously borrowed money from Republic Bank for real estate development.
Lack signed a promissory note for over one million dollars on April 15, 1986. Waldron signed the mortgage for Diamond C on April 28, 1986, and the mortgage was recorded on June 6, 1986. The Diamond C property was appraised at over a million dollars. Lack also gave a second mortgage on his home and a lot which were valued at less than $50,000, as additional security.
In January of 1989 Republic Bank filed this foreclosure action against Diamond C on the 53 acres. Diamond C raised the affirmative defense of a satisfaction which was signed by Republic's president, Phil Shunk, on May 21, 1986, but was not recorded until Waldron recorded it on March 6, 1989, after the filing of this foreclosure. Republic Bank replied to that defense alleging it was precluded by the D'Oench, Duhme doctrine. In June of 1990 the complaint was amended to name FDIC, as manager of the FSLIC Resolution Fund, as plaintiff. The FDIC amended the response to the affirmative defense of satisfaction to assert that the satisfaction was also barred by 12 U.S.C. § 1823(e).
In D'Oench the FDIC had acquired a promissory note executed by D'Oench to a bank. D'Oench raised the affirmative defense of lack of consideration based on a receipt D'Oench had received from the bank which stated that the note would not be called for payment. The Supreme Court held that D'Oench could not rely on the bank's agreement not to collect because the agreement was not reflected in the bank's records. The significance of D'Oench, beyond its specific holding, was that it "declared that a federal policy existed to protect the FDIC against misrepresentations as to the assets and liabilities in the portfolios of the banks which it insured or to which it made loans." Lassiter v. Resolution Trust Corp., 610 So.2d 531, 534 (Fla. 5th DCA 1992).
After D'Oench the following provision was enacted as part of the Federal Deposit Insurance *159 Act of 1950, § 2[13](e), 64 Stat. 889, as amended, 12 U.S.C. § 1823(e):
No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement 
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.
Section 1823(e) has been characterized as a codification of D'Oench. Sunchase Apartments v. Sunbelt Service Corp., 596 So.2d 119 (Fla. 1st DCA 1992).
The purposes of § 1823(e) are "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets" and "to ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley v. FDIC, 484 U.S. 86, 91-92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).
There was no evidence that the satisfaction complies with § 1823(e)(3), which requires approval by the board of directors, or the loan committee, which approval must be reflected in the minutes of the bank. In Federal Deposit Ins. Corp. v. Manatt, 922 F.2d 486 (8th Cir.1991), the borrower raised the defense of a written agreement with the bank which he claimed extinguished his debt. The district court granted a partial summary judgment because the agreement did not comply with § 1823(e)(3), and the eighth circuit affirmed, stating on page 488:
Manatt tries to use the Mutual Agreement to defeat the FDIC's right to collect on the notes it acquired from Corning Bank. To have such effect, the Mutual Agreement must comply with all the requirements of section 1823(e). If the agreement fails to meet any one of the four requirements therein, the FDIC is not bound by the agreement. Though the district court only suggested it, Manatt, 688 F. Supp. at 1330, we expressly hold as a matter of law that the Mutual Agreement was insufficiently recorded in the minutes of the bank's Board of Directors to satisfy clause (3) of section 1823(e). The board minutes did not recite that the agreement was attached, or set out its terms, or even specifically refer to Scott Manatt.
As to § 1823(e)(4), which requires that the satisfaction must be an official record of the bank continuously from its execution, Diamond C relies heavily on the testimony of Judy Primos. She testified that she witnessed bank president Shunk's signature on the satisfaction in May of 1986, that she made a copy which she put "into the file for Mr. Shunk," and that she gave the original to a lawyer. Primos further testified that approximately two weeks later she saw that a copy was in the "file." She had no further knowledge. Nor was there evidence reflecting that the "file" to which Primos was referring was "an official record" of the bank, as required by § 1823(e)(4). Diamond C also relies on a "collateral checklist" which indicates the existence of a satisfaction; however, that document, which contains no date, was prepared by the FDIC after it had taken over the bank and the satisfaction had been recorded.
The first regulatory examination of the bank after this loan was in February of 1987. The examiner testified there was nothing in this loan file to indicate the mortgage had been satisfied or that the collateral was impaired. He further testified that if the collateral for this million dollar loan had been impaired at that time it would have been significant enough for him to request that the bank be shut down.
In November of 1987 bank president Shunk responded to bank examiners' criticisms *160 of the bank's dealings with Waldron by stating in a report that the collateral for this loan, the Diamond C property, had recently been appraised at over one million dollars, and that the bank had obtained a title insurance policy insuring the bank's lien on the property.
When the bank was examined again in March of 1988 the loan file still reflected this property as the primary asset securing the loan, and did not reflect a satisfaction. When the bank examiner attempted to discuss this with the bank's officers, they took the Fifth Amendment. Shunk and other bank officers also took the Fifth Amendment in this lawsuit.
In Langley the Supreme Court stated:
The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. It would be rewriting the statute to hold otherwise. 484 U.S. at 94, 108 S.Ct. at 403.
In Beighley v. Federal Deposit Ins. Corp., 868 F.2d 776 (5th Cir.1989), the court affirmed a summary judgment for the FDIC, noting that although a finder of fact might have been able to conclude by inference that a collateral agreement had existed between the bank and the borrower, that type of proof does not meet the "certainty" required by § 1823(e), citing Langley.
Viewing the evidence in a light most favorable to Diamond C, the most that can be said is that a copy of the unrecorded satisfaction was in a file at the bank at the time it was signed in May of 1986, and two weeks after that. It was undisputed that when the bank was examined in February of 1987 and March of 1988, long after Shunk signed the satisfaction, there was no indication that the mortgage had been satisfied. On the contrary Shunk was telling the bank examiners that this collateral had been appraised for more than one million dollars.
This satisfaction did not meet the requirements of either subsections (3) or (4) of § 1823(e), and was therefore insufficient as a defense as a matter of law.
Diamond C emphasizes that the trial judge found no scheme to defraud the bank examiners; however, fraud is not a requirement. Twin Const., Inc. v. Boca Raton, Inc., 925 F.2d 378, 382 (11th Cir.1991). The question is whether a party "lent himself to a transaction which is likely to mislead banking authorities." FDIC v. Investors Associates X, Ltd., 775 F.2d 152 (6th Cir.1985).
Diamond C also argues that it was only putting up its collateral for a short period of time, in order that Lack and Buckner could restructure their loans, and that the workout was completed within 60 to 90 days, long before the next regulatory examination. The problem with this theory is that there were no written documents reflecting the workout arrangement or that the Diamond C collateral was allegedly to be used for a limited period. Nor was there anything in the bank records which would have confirmed this. It is thus a factual situation similar to the one presented in D'Oench, in which there was nothing in the bank records to reflect the bank's agreement not to collect on the promissory note. Moreover, Diamond C's argument that the workout was completed within 60 to 90 days of the loan flies in the face of the uncontradicted evidence that over a year later the bank president was representing to the regulatory authority that this collateral did support the loan.
The trial court also concluded that Diamond C did not receive any consideration for the mortgage, notwithstanding that in August of 1986, Republic transferred $200,000 of undisbursed funds from this loan to another Waldron company, Diamond C Enterprises. Even if Diamond C had received nothing, the consideration flowing to Lack and Buckner, the obligors whom Diamond C was putting up its collateral to help, was consideration sufficient to support the mortgage. Florida Asphalt Pavement Mfg., Co. v. Federal Reserve Bank of Atlanta, 76 F.2d 326 (5th Cir.1935). Moreover, D'Oench involved the same defense, lack of consideration, and the Court held it was unavailable unless it was reflected in the bank's official records.
*161 The trial court also concluded that the bank had impaired Diamond C's collateral; however, at best the evidence showed that this was based on the bank's release of a second mortgage from Lack secured by collateral worth less than $50,000, in return for a payment of $70,000 of past due interest.
We therefore reverse with instructions to enter final judgment in favor of FDIC.
GUNTHER and POLEN, JJ., concur.