Charles Mac Smith and Beverly V. Smith appeal from a judgment entered on a jury verdict in favor of First Commercial Bank of Huntsville, Inc. ("the Bank"), on the Bank's claim alleging breach of contract and on the Smiths' counterclaims alleging abuse of process, breach of an oral contract, interference with business relations, fraud, suppression, and conspiracy. We affirm the judgment in favor of the Bank on the Smiths' counterclaims; we reverse the judgment in favor of the Bank on its breach-of-contract claim and remand the cause with instructions to enter a judgment in favor of the Smiths on that claim.
In the summer of 1998, Charles "Mac" Smith, a longtime customer of the Bank, decided to go into the new-house construction business with Russell E. Rogers, the proprietor of RER, Inc. On June 8, 1998, the Bank loaned Smith $105,000 to purchase half of the outstanding shares of RER stock ("the Smith loan"). The Smith loan was secured by a second mortgage on the Smiths' personal residence and a guaranty by RER. Smith and Rogers agreed to *Page 223 
a division of labor whereby Rogers retained overall management and control of RER, including sales, accounting, and record-keeping, and Smith took charge of the actual construction process.
On July 28, 1998, the Bank provided the construction financing for RER's building of two houses, one in the Biltmore Bend subdivision and one in the Stratford Square subdivision ("the construction-financing loans"). On that date, RER executed two promissory notes, each in the amount of $344,000, to the Bank. The notes were secured by real-estate mortgages on the two properties and by personal guarantees from Mac Smith and Rogers.
In the fall of 1998, Smith and Rogers decided to dissolve their business relationship. On November 23, 1998, Smith resigned as an officer and director of RER and Rogers agreed to pay him $105,000 for his stock within 5 days. Soon thereafter, however, Rogers informed Smith that RER was experiencing financial difficulties and could not come up with the funds to pay for Smith's stock.
Rogers approached the Bank about obtaining a loan to purchase Smith's shares, but the Bank rejected his loan application. Rogers told the Bank that he needed to find a way to buy out Smith and to have RER's guaranty on the Smith loan released. Rogers insisted that the Bank had mistakenly characterized RER's guaranty on that loan as "continuing and unlimited" — thus making RER contingently liable for Smith's other indebtedness[1] to the Bank, rather than liable only for the indebtedness reflected by the Smith loan. The Bank agreed with Rogers that the RER guaranty of the Smith loan should not have been characterized as unlimited and continuing. Rogers inquired whether the Bank would release the RER guaranty and agree to a sale by RER of the Biltmore Bend and Stratford Square properties to Smith. The Bank agreed to release the RER guaranty of the Smith loan in exchange for RER's paying the Bank $51,000, with the $51,000 to be applied by the Bank to Smith's indebtedness. The Bank also agreed to the transfer of the Biltmore Bend and Stratford Square properties from RER to Smith under certain conditions.
Rogers then proposed to Smith an alternate plan for repurchasing Smith's shares of RER stock. That plan provided that Smith would give up his interest in RER in exchange for the equity in the Biltmore Bend and Stratford Square houses of which Smith had been supervising the construction. The proposed dissolution agreement provided that Smith would assume the construction loans for the two houses, would complete the construction, and would realize any profit made upon the sale of the properties.
Two contracts were signed on March 18, 1999, to reflect the agreements reached between and among Smith, Rogers, RER, and the Bank. The first agreement, entitled a "Settlement and Release" was executed by Mac Smith and Russell E. Rogers, individually and as president of RER. The second agreement, entitled "Agreement to Convert Debt to Non-Recourse, to Release Guaranty, and for Limited Waiver of Due-on-Sale Clause," was executed by Mac Smith; Beverly V. Smith; Rogers, individually and as president of RER; and David Kimrey, as senior vice president of the Bank.
The settlement and release agreement provides, in pertinent part: *Page 224 
 "This Settlement and Release (hereinafter `AGREEMENT') is made this day, March 18, 1999, by, between, and among Russell E. Rogers (hereinafter `ROGERS'), Charlie M. (Mac) Smith (hereinafter `SMITH') and RER, Inc. (hereinafter `CORPORATION').
 "Recitals
 "WHEREAS, SMITH is the owner of 2500 shares of the CORPORATION'S common stock (the `Shares') that he originally purchased from ROGERS; and,
 "WHEREAS, ROGERS is the CORPORATION'S only other stockholder; and,
 "WHEREAS ROGERS and SMITH entered into a Buy and Sell Agreement between themselves and the CORPORATION on June 9, 1998 (the `Buy/Sell'); and,
 "WHEREAS, ROGERS and SMITH entered into a Shareholder Repurchase Agreement between themselves and the CORPORATION dated November 23, 1998 (the `PURCHASE AGREEMENT'); and,
 "WHEREAS SMITH has resigned as both an officer and director of the CORPORATION, and said resignation is hereby accepted, pursuant to the Purchase Agreement; and,
 "WHEREAS, the CORPORATION owns two lots upon which residences are being constructed, each being subject to a mortgage in favor of First Commercial Bank of Huntsville (hereinafter, `BANK'); and,
 "WHEREAS, SMITH is personally indebted to the BANK in the original amount of $105,000.00, which was guaranteed by the CORPORATION (the `SMITH LOAN'); and,
 "WHEREAS, certain disputes have arisen between ROGERS and SMITH with respect to claims by each against the other and claims by each against CORPORATION; and,
 "WHEREAS, ROGERS, SMITH, and CORPORATION have agreed to compromise and settle those disputes in a manner and fashion which is intended and will benefit CORPORATION; and,
 "WHEREAS, ROGERS, SMITH, and CORPORATION have agreed that the terms of the settlement are fair and equitable to CORPORATION, SMITH and ROGERS, taking into consideration all relevant factors, including the claims of the respective parties; and
 "WHEREAS, ROGERS, SMITH, and CORPORATION have agreed that the transfers herein are made for a good and valuable consideration, with due consideration being given by each party to the respective values of the assets being transferred by each party, the liabilities being herein assumed, the indemnity being provided and the prospective relations of the parties in the future.
 "NOW, THEREFORE, this agreement, WITNESSETH: that for and in consideration of the mutual promises and covenants hereinafter expressed and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each party hereto, the parties have agreed as follows:
 "Section 1. Modification of Obligations. To the extent not previously performed, the obligations of SMITH, ROGERS, and the CORPORATION under both the Purchase Agreement and the Buy/Sell are extinguished and replaced by the terms of this Agreement.
 "Section 2. Redemption of Stock and Conveyance of Lots. The CORPORATION and ROGERS hereby agree to *Page 225 
redeem from SMITH all 2500 shares of common stock in exchange for the transfer by CORPORATION (with SMITH assuming all liability associated with the property being transferred) of Lot 19 of Biltmore Bend, Phase Two, and Lot 19 of Stratford Square, each of which is further described in attached exhibit `A,' incorporated herein by reference (the `LOTS') at the closing described below.
 "The LOTS shall be conveyed to SMITH or his nominee subject to the lien for property taxes, which are not yet due and payable, and the existing mortgages to the BANK . . . (collectively the `LOT MORTGAGES')."
(Capitalization in original.) The nonrecourse agreement provides, in pertinent part:
 "This agreement made by and among RER, Inc. (`RER'), Russell Rogers, Jr., Charlie M. Smith (cumulatively, `Guarantors') and First Commercial Bank of Huntsville (`Lender') this 18th day of March 1999, as follows:
 "RECITALS
 "WHEREAS, RER is currently the owner of properties which are secured by [two] Mortgages [reciting the place of recordation in the office of the Madison Probate Judge];
 "WHEREAS, said Mortgages secure the obligations reflected in [two] certain Commercial Fixed Rate Revolving or Draw Note[s] dated July 28, 1998, [each] in the original principal amount of $344,000 (cumulatively, `Notes');
 "WHEREAS, Guarantors guarantee the Notes pursuant to Guarantees dated July 28, 1998 (cumulatively `Guarantees');
 "WHEREAS, RER is also indebted to Lender pursuant to an Unlimited Continuing Guaranty (`RER Guaranty') dated June 8, 1998, guaranteeing other debts of Charlie M. Smith;
 "WHEREAS, the Mortgages, the Notes, the Guarantees, the RER Guaranty and other documents executed by RER provide additional security to the Lender and represent the loan documents executed by RER in this matter (cumulatively `Loan Documents');
 "WHEREAS, RER desires to sell its interest in the property encumbered by the Mortgages to Charlie M. Smith or his assigns, subject to the Lender's approval;
 "WHEREAS, RER and Rogers desire to have their respective guarantees released and to have the Notes modified to reflect that they shall be non-recourse as against RER, and the Lender has agreed to such in exchange for the payment by RER and Rogers to the Bank of $51,000;
 "WHEREAS, Charlie M. Smith or his assigns shall assume the obligations represented by the Loan Documents and pledge additional collateral to the Notes if the Lender agrees not to exercise its option to accelerate the unpaid balance of Notes as a result of the transfer, to waive its exercise of any other rights and remedies it may have under the Loan Documents arising from the transfer;
 "NOW THEREFORE, the parties to this Agreement agree as follows:
 "1. Acknowledgment of Indebtedness. The parties acknowledge that as of the date hereof:
 "(i) RER is indebted to the Lender for principal, accrued and unpaid interest and other charges on the first note, as of March 12, 1999, in the amount of $206,700.44, and on the second note as of March 12, 1999, in the amount of $248,985.25 with interest and charges continuing to accrue; *Page 226 
 "(ii) All such amounts are due and payable in full, without offset, deduction or counterclaim of any kind or character whatsoever, but are subject to increase, decrease or other adjustment as a result of any and all interest, fees and other charges, including, without limitation, attorneys fees and costs of collection, which are payable to Lender under the Loan Documents.
 "2. Assumption of Liability; Additional Collateral. Smith or his assigns assume and agree to pay the obligations represented by Notes and all other Loan Documents. Copies of these documents have been provided to Smith, and are incorporated herein by reference. Smith or his assigns acknowledge that the real property described in the Mortgages shall remain subject to the Mortgages, that all real and personal property described in the various Loan Documents shall remain subject to the various Loan Documents, and that nothing in this agreement shall affect priority of any of Lender's liens over other liens and encumbrances against the real and personal property. Smith or his assigns agree to be bound by all of the conditions and covenants contained in the Loan Documents. Further, as additional Collateral for the Notes, the Smith guarantee and the obligations of Smith's assigns, and as an accommodation, without which the Lender would not make this modification, that Smith's guaranty of the Notes shall be secured by Smith and his wife Beverly V. Smith, who shall grant to Lender, as cross-collateralization, that certain preexisting mortgage lien and security title to [their residence].
 "3. Consent to Transfer. Based upon the terms and conditions contained herein, including, but not limited to, the assumption of liability by Smith to Lender and the contingent liability of Smith to Lender, Lender hereby consents to the transfer of all property described in the Mortgage and Loan Documents, and waives its right to declare default and its right to accelerate the entire unpaid balance of Notes. Further, First Commercial waives enforcement of its rights under any of the Loan Documents prohibiting the assignability of any of the obligations of RER under this agreement. It is agreed by the parties that this waiver is made solely for the benefit of RER and its Guarantors, and shall not constitute a waiver by the Lender of any rights under the Loan Documents in the event of a subsequent sale of or default by Smith or his assigns under the Loan Documents.
 "4. Modification of Notes and Release of Certain Guaranties. Based upon the payment of FIFTY-ONE THOUSAND and NO/100 DOLLARS ($51,000) and other good and valuable consideration, to be paid upon the execution of this agreement, the Lender agrees to modify and amend the Notes and to modify the obligation of RER under the Notes to reflect that Lender shall seek satisfaction of the indebtedness under the Notes only from the collateral, Smith and/or his assigns. Based upon the same consideration, Lender hereby releases Rogers from his Guaranty and RER from the RER Guaranty.
 "5. Miscellaneous Clauses.
 "a. Entire Agreement. This Agreement reflects the entire understanding of the part[ies] with respect to the subject matter contained herein, and supersedes any prior agreements, whether written or oral, in regard thereto.
 "b. Allocation. Lender shall be entitled to accept such payments and proceeds as are remitted to it *Page 227 
pursuant to this provision and shall be entitled to apply any and all such proceeds and payments against the liabilities and obligations owed by RER or Smith to Lender in such order of application as Lender in its sole and absolute discretion shall determine proper.
 "c. Full Force and Effect. Except as expressly modified herein, all terms of the Loan Documents shall remain in full force and effect and shall constitute the legal, valid, binding and enforceable obligations of RER and the Guarantors to the Lender.
 "d. No waiver. This Agreement is not intended to operate as, and shall not be construed as a waiver of any of the provisions of the Loan Documents except as expressly stated herein, or of any rights of the Lender . . . whether known or unknown, as to which all of such rights of the Lender shall remain reserved.
 "e. Binding Nature. This Agreement shall be binding upon and inured to the benefit of the parties and their respective successors and assigns, and such provision shall not be construed to permit assignment by Smith or his assigns, RER, or the Guarantors without consent of the Lender.
 "f. Captions. The captions, the sections and the paragraphs of this agreement are for the convenience of the parties only, and are not a part of this Agreement.
 "g. Enforcement. Should any party be caused to seek enforcement of this Agreement, the prevailing party shall be entitled to all costs of enforcement, including reasonable attorney's fees."
(Capitalization in original.)
On May 28, 1999, RER filed for bankruptcy protection. On September 30, 1999, RER's trustee in bankruptcy filed an adversary proceeding against Mac Smith, pursuant to11 U.S.C. § 547(b), seeking to set aside the March 18, 1999, transfer of assets from RER to Smith — assets worth approximately $300,000, according to the trustee.[2] The trustee eventually settled its claim against Smith for $15,000 and released Smith from liability on all claims.
In June 2000, the trustee filed an adversary proceeding against the Bank, seeking to set aside RER's transfer of $51,000 to the Bank on March 18, 1999. The Bank moved for a summary judgment, alleging "that the Trustee ha[d] already litigated and compromised the very claims raised in th[e] action against [Mac Smith,] the individual for whose benefit the alleged preferential transfer was actually made," and that the alleged transfer was not for the benefit of the Bank but for the benefit of a third party, Mac Smith, who, the Bank asserted, should be joined as a necessary party.
On October 16, 2000, the Bank moved to add Mac Smith as a third-party defendant in the trustee's adversary proceeding, maintaining that if it were required to return the $51,000 to the bankruptcy estate of RER, then Mac Smith, who had received the benefit of a $51,000 reduction in his debt to the Bank, should reimburse the Bank for what it paid to the bankruptcy trustee. The bankruptcy court denied the Bank's motion, stating that the Bank was free to seek recourse against Mac Smith in state court. Before the bankruptcy *Page 228 
court ruled on the Bank's summary-judgment motion, the Bank settled with the trustee for the sum of $27,000.
On May 8, 2001, the Bank sued Mac Smith in Madison Circuit Court, alleging a breach of contract and various equitable theories of restitution and seeking reimbursement of the $27,000 it had paid to RER's trustee in bankruptcy. Smith's wife, Beverly V. Smith, intervened, alleging that she was a party to the contract made the basis of the Bank's complaint against her husband. The Smiths answered, asserting, among other things, the affirmative defenses of judicial estoppel; accord and satisfaction; and voluntary payment, i.e., that the Bank's $27,000 settlement with RER's trustee in bankruptcy was a voluntary payment made without notice to or authorization by the Smiths. The Smiths also counterclaimed against the Bank, alleging abuse of process, breach of an oral contract, interference with business relations, fraud, suppression, and conspiracy. The Bank dismissed its equitable claims, and the case proceeded to trial on the Bank's breach-of-contract claim and four of the six counterclaims asserted by the Smiths.[3]
At trial, the evidence was undisputed that Mac Smith sold the Biltmore Bend and Stratford Square houses at a substantial profit and paid in full the two $344,000 construction-financing loans to the Bank. The record contains satisfaction-of-lien documents recorded in the Madison Probate Court for each mortgage. The evidence was also undisputed that the Smith loan had been paid in full. The record contains documentary evidence indicating that on March 19, 1999, the Bank posted a $51,000 "special payment" to reduce the indebtedness on the Smith loan.
The Smiths moved for a judgment as a matter of law ("JML") at the close of the Bank's evidence and at the close of all the evidence; the trial court denied the motions. Following a five-day trial, the jury returned a verdict in favor of the Bank in the amount of $27,000 on its breach-of-contract claim and against the Smiths on all of the counterclaims. Pursuant to a posttrial motion by the Bank, the trial court, on November 8, 2004, awarded the Bank prejudgment interest in the amount of $9,341.28, attorney's fees in the amount of $13,500.00, expenses in the amount of $932.45, and costs in the amount of $3,612.70, for a total judgment of $54,386.43.
On December 8, 2004, the Smiths filed a postjudgment motion for a JML or, in the alternative, for a new trial. The trial court denied the motion on December 10, 2004, and the Smiths timely appealed to the Alabama Supreme Court on January 21, 2005. On January 27, 2005, the supreme court determined that the case was within the appellate jurisdiction of the Court of Civil Appeals and it transferred the appeal to this court.[4]
 I.
The Smiths argue that there was no evidence supporting the Bank's breach-of-contract claim and, accordingly, that the trial court erred in failing to grant their motions for a JML at the close of the Bank's evidence, at the close of all the evidence, and after a judgment was entered on the jury verdict. *Page 229 
 "`"A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to [a] judgment as a matter of law." Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997) (internal quotation marks omitted). "[I]n reviewing the record to determine whether a trial court properly [granted a judgment as a matter of law], we `must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw.' Renfro v. Georgia Power Co., 604 So.2d 408, 411 (Ala. 1992)." Gewin v. TCF Asset Mgmt. Corp., 668 So.2d 523, 526 (Ala. 1995).'
 "Vaughan v. Oliver, 822 So.2d 1163, 1168
(Ala. 2001)."
Lyons v. Walker Reg'l Med. Ctr., Inc., 868 So.2d 1071,1092 (Ala. 2003).
 "A presumption of correctness attaches to a jury verdict, `if the verdict passes the "sufficiency test" presented by motions for a directed verdict and a JNOV.' S W Properties, Inc. v. American Motorists Ins. Co., 668 So.2d 529, 534
(Ala. 1995). (Rule 50(a), Ala. R. Civ. P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.)"
New Plan Realty Trust v. Morgan, 792 So.2d 351, 355
(Ala. 2000).
In support of their argument that the Bank presented insufficient evidence to establish its breach-of-contract claim, the Smiths point out that the Bank rested its case "without calling a single employee of the Bank or bank officer to identify what contract [Mac] Smith breached and to describe how he breached same." The Bank counters by asserting that no witnesses were necessary to establish Mac Smith's breach of contract because, the Bank says, the documentary evidence (specifically, the March 18, 1999, nonrecourse agreement and paragraph 9 of Smith's July 28, 1998, guaranty of the RER construction-financing loans) established Smith's contractual liability to repay the Bank the $27,000 it paid to RER's trustee in bankruptcy, and Smith's nonpayment of that sum was undisputed.
The Bank is correct that, if the documentary evidence established Mac Smith's contractual liability to reimburse the Bank for the $27,000 payment it made to the bankruptcy trustee, no witnesses were necessary to establish Smith's alleged breach of contract because Smith admitted that he had not reimbursed the Bank. Therefore, we must determine whether the documents relied on by the Bank established Smith's contractual liability.
The Bank describes the legal effect of the nonrecourse agreement as follows:
 "The Agreement converts the corporate responsibility of RER to that of non-recourse, which means that the two properties would remain mortgaged to the Bank, but there would be no other liability on RER. Further, the Rogers'[s] guaranty [of the construction-financing loans] was released, as was a second RER guarantee on another loan transaction [the Smith loan].
 "The Agreement further provided that [Mac] Smith (pursuant to [his] guaranty [of the RER construction-financing loans]) would become primarily responsible for all of the indebtedness [on the construction-financing loans]." *Page 230 
We agree with the Bank's assessment. After the signing of the nonrecourse agreement, the only guaranty remaining was Smith's guaranty of the construction-financing loans. Paragraph 9 of Smith's guaranty states:
 "If any payment applied by Lender to indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency, or reorganization of Borrower or any other obligor), the indebtedness to which such payment was applied shall for the purposes of this guaranty be deemed to have continued in existence, notwithstanding such application, and this guaranty shall be enforceable as to such indebtedness as fully as if such application had never been made."
(Emphasis added.) The Bank argues that the following series of events established Mac Smith's contractual liability pursuant to paragraph 9 of the guaranty agreement: (1) the Bank applied the $51,000 payment it received from RER pursuant to the nonrecourse agreement to Smith's indebtedness; (2) RER sought bankruptcy protection; (3) RER's trustee in bankruptcy sued the Bank to recover the $51,000 transfer; (4) the Bank settled with the trustee for $27,000; (5) that portion of the indebtedness that the Bank was required to return (i.e., $27,000 out of $51,000) continues in existence and Smith is obligated to pay it.
The Smiths reply that paragraph 9 of the guaranty agreement might be applicable if the Bank had applied $51,000 to the indebtedness on the construction-financing loans — which, they say, are the only loans that are covered by Mac Smith's guaranty — but, the Smiths say, the evidence was undisputed that the Bank applied $51,000 to the Smith loan, not to the construction-financing loans. The Bank makes two arguments in response.
First, the Bank says, paragraph 5b. of the nonrecourse agreement allowed it to apply the $51,000 to any of Smith's debts it chose. Paragraph 5b. states:
 "b. Allocation. Lender shall be entitled to accept such payments and proceeds as are remitted to it pursuant to this provision and shall be entitled to apply any and all such proceeds and payments against the liabilities and obligations owed by RER or Smith to Lender in such order of application as Lender in its sole and absolute discretion shall determine proper."
We agree with the Bank; paragraph 5b. clearly gives the Bank the absolute right to apply the $51,000 payment it received from RER to any of Smith's debts. The fact is, however, that the Bank actually applied the payment to the Smith loan, not to the construction-financing loans, the only loans covered by Mac Smith's July 28, 1998, guaranty. Compare American Nat'lBank Trust Co. v. Mack, 311 Ill.App.3d 583, 588, 724
N.E.2d 1014, 1018, 244 Ill.Dec. 126, 130 (2000) (holding that former law partner's guaranty of firm's debt was discharged by payment; even though creditor was entitled to allocate firm's payments in any manner it chose, the creditor "actually allocate[d] the payments received" to debts not covered by the guaranty).
Second, the Bank says, Smith's July 28, 1998, guaranty wasboth a guaranty of the construction-loan indebtednessand a guaranty of RER's guaranty of the Smith loan. This argument is untenable in light of the fact that the nonrecourse agreement released RER's guaranty of the Smith loan. In short, Smith's guaranty was the only guaranty that survived the signing of the nonrecourse agreement and it related solely to the construction-financing loans. Because *Page 231 "the indebtedness to which [the $51,000] payment wasapplied" was not the indebtedness incurred as a consequence of the construction-financing loans, paragraph 9 of Smith's guaranty has no application.
We, therefore, hold that the documents relied on by the Bank do not establish Mac Smith's contractual liability to repay to the Bank the $27,000 it paid to RER's trustee in bankruptcy. Although the Bank alleges, in its appellate brief, that Smith will be "unjustly enriched" unless he is required to repay the $27,000 to the Bank, any such argument is unavailing because the Bank dismissed its equitable claims before trial.[5]
Because the evidence was insufficient to establish the Bank's breach-of-contract claim, the trial court erred by denying the Smiths' motions for a JML.
 II.
The Smiths argue that the trial court erred by denying their postjudgment motion seeking a new trial on their counterclaims. *Page 232 
They claim that the trial court's refusal to postpone the trial because of the threat of severe weather was prejudicial to them.
The trial began on Tuesday, September 14, 2004. On Wednesday, September 15, after the Bank had completed the presentation of its case, the court administrator interrupted the proceedings to state that area public schools and governmental offices were closing as Hurricane Ivan approached the Gulf Coast; the court administrator inquired whether the court intended to recess the trial until after the hurricane had passed through the area. The court declined to recess the trial and, at the end of the trial proceedings on Wednesday, the court informed the jurors that, although the courthouse entrances would be closed and locked on Thursday morning, they should report for service and enter through the basement door on the north side of the building. The Smiths contend that the court's refusal to adjourn the trial adversely impacted the jurors' ability to hear, deliberate, and decide upon their counterclaims.
The grant or denial of a postjudgment motion rests within the sound discretion of the trial court, Flagstar Enters., Inc.v. Foster, 779 So.2d 1220, 1221 (Ala. 2000), and a trial court's ruling on such a motion will not be reversed on appeal unless a legal right was abridged and the record plainly and palpably demonstrates error, Bell v. Greer853 So.2d 1015, 1018-19 (Ala.Civ.App. 2003). The record does not demonstrate error. In fact, it provides no support for the Smiths' argument, which appears to be based upon nothing other than speculation. The Smiths presented no evidence indicating that the approach of Hurricane Ivan "either distracted the jurors from the evidence being presented in [their] trial, or prejudiced them in any way against the defense." Harris v.State, 84 P.3d 731, 740 (Okla.Crim.App. 2004) (holding that a criminal defendant was not entitled to a mistrial based on the fact that his trial was conducted during the week of the terrorist attacks on September 11, 2001).
 III.
The Smiths also contend that the trial court erred by denying their postjudgment motion for a JML on their counterclaims. The fraud, suppression, and conspiracy counterclaims were based upon the following allegations: that during the negotiation process among the Smiths, Rogers, and the Bank that ultimately resulted in the settlement and release and nonrecourse agreements of March 18, 1999, the parties circulated among themselves and their attorneys tentative drafts of the agreements; that the Smiths, at the time they signed the final draft of the agreements on March 18, were led to believe that those agreements were the same as an earlier tentative draft they had approved on March 11; and that neither their attorney nor any other party explained that the final drafts differed markedly from the earlier drafts.
There was no evidence at trial indicating that anyone had assured the Smiths that the agreements they signed on March 18 were the same as earlier tentative drafts they had approved.
 "`[A] person who signs a contract document is on notice of the terms therein and is bound thereby, even if he or she fails to read the document.' Safeway Ins. Co. of Alabama, Inc. v. Taylor, 758 So.2d 523, 525 (Ala. 1999). There is a general duty on the part of a person to read the documents received in connection with any transaction. Gilmore v. M B Realty Co., 895 So.2d 200 (Ala. 2004)." *Page 233 
Brown v. St. Vincent's Hosp., 899 So.2d 227, 242
(Ala. 2004). See also Locklear Dodge City, Inc. v.Kimbrell, 703 So.2d 303 (Ala. 1997); and Power Equip.Co. v. First Alabama Bank, 585 So.2d 1291 (Ala. 1991).
The breach-of-oral-contract counterclaim was grounded on the allegation that Mac Smith had reached certain oral agreements with a Bank officer that were not incorporated into the March 18 agreements. Section 5a. of the nonrecourse agreement, however, contained the following merger clause:
 "a. Entire Agreement. This Agreement reflects the entire understanding of the part[ies] with respect to the subject matter contained herein, and supersedes any prior agreements, whether written or oral, in regard thereto."
In Belmont Homes, Inc. v. Law, 841 So.2d 237
(Ala. 2002), our supreme court explained:
 "A `merger clause' is `a clause which states that all oral representations or agreements are merged into and subsumed by the written document of which the clause is a part.' Sunchase Apartments v. Sunbelt Serv. Corp., 596 So.2d 119, 122 (Fla.Dist.Ct.App. 1992). `A merger clause operates only to establish that a written agreement is a completely integrated document, into which all prior and contemporaneous negotiations are merged.' Crimson Indus., Inc. v. Kirkland, 736 So.2d 597, 601 (Ala. 1999). When a contract is integrated, `no extrinsic evidence of prior or contemporaneous agreements will be admissible to change, alter, or contradict the contractual writing.' Sherman v. Woerner Magnolia Farms, Inc., 565 So.2d 601, 605 (Ala. 1990)."
841 So.2d at 240.
 "`Merger clauses . . . have been given effect in Alabama for years. In Stallings v. Savage, 206 Ala. 486, 97 [90] So. 904 (1921), the Court held that parol evidence was properly excluded in an action for breach of contract in the sale of an automobile when the contract contained a clause which provided: "This constitutes the entire purchase agreement." See, also, Shepherd Realty Co. v. Winn-Dixie Montgomery, Inc., 418 So.2d 871 (Ala. 1982).'"
Bussey v. John Deere Co., 531 So.2d 860, 862-63
(Ala. 1988). The trial court did not err in denying the Smiths' postjudgment motion for a JML on their counterclaims.
In light of our disposition of the issue addressed in Part I of this opinion, it is unnecessary to address the Smiths' arguments with respect to the award of interest, expenses, attorney's fees, and costs on the Bank's breach-of-contract claim.
The judgment in favor of the Bank on the Smiths' counterclaims is affirmed. The judgment in favor of the Bank on its breach-of-contract claim is reversed, and the cause is remanded with instructions to enter a judgment for the Smiths on that claim.
The Bank's request for an attorney fee on appeal is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON and MURDOCK, JJ., concur.
PITTMAN and BRYAN, JJ., concur in the result, without writing.
[1] Smith had other personal loans at the Bank that were unrelated to his dealings with Rogers or RER.
[2] At trial, Mac Smith testified that the trustee's valuation of the assets included the profit Smith had made on the sale of the Biltmore Bend and Stratford Square houses as well as the $51,000 benefit Smith had received pursuant to the agreements entered into on March 18, 1999.
[3] At trial, the Smiths dismissed the counter-claims alleging abuse of process and interference with business relations.
[4] Section 12-3-10 provides, in pertinent part, that the Court of Civil Appeals "shall have exclusive appellate jurisdiction of all civil cases where the amount involved,exclusive of interest and costs, does not exceed $50,000." (Emphasis added.)
[5] We note, as did the United States District Court for the Middle District of Alabama in Home Insurance Co. v.Hartford Fire Insurance Co., 379 F.Supp.2d 1282
(M.D.Ala.2005), that "[t]here is potentially an alternative basis for resolution of these claims. . . . [A]nd while the court does not rely on it because the parties have not fully briefed the issue, the court will set forth the analysis."379 F.Supp.2d at 1290 n. 8.
The Smiths asserted the affirmative defense of voluntary payment in their answer, argued voluntary payment as a ground for their summary-judgment motion, and re-argued voluntary payment as a basis for their motion for a JML at the close of all the evidence at trial. On appeal, the Smiths make the assertion in brief, without developing the argument or citing any authority, that the Bank is precluded by the voluntary-payment doctrine from proceeding against them to recoup the $27,0000 the Bank paid to RER's trustee in bankruptcy. In Home Insurance Co. v. Hartford FireInsurance Co., the court explained:
 "It has been the law in Alabama for over 150 years that where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion. Mt. Airy Ins. Co. v. Doe Law Firm, 668 So.2d 534, 537 (Ala. 1995); U-Haul Co. of Ala. v. Johnson, 893 So.2d 307, 311
(Ala. 2004); Stone v. Mellon Mortgage Co., 771 So.2d 451, 456 (Ala. 2000). See also Allstate Ins. Co. v. Amerisure Ins. Cos., 603 So.2d 961
(Ala. 1992). . . . `Alabama law recognizes that the mere threat of legal proceedings is insufficient to constitute the duress needed to make the payment of money involuntary.' Mt. Airy, 668 So.2d at 538. In Mt. Airy, the insurer paid to settle a potential malpractice claim against the insured and then sought reimbursement from the insured for the amount paid to settle the claim. Although the insurer gave notice to the insured that it would seek to recover the money, the court held that `such a protest by itself was insufficient to make the payment "involuntary."' Id. Because the court concluded that the payment to settle the claim was voluntary, the insurer was not entitled to seek reimbursement. Id. at 539. . . .
 "`Claims based on theories of breach of contract, unjust enrichment, and money had and received are precluded by proof that the plaintiff voluntarily paid what he or she is seeking to recover.'
 "Stone, 771 So.2d at 456."
379 F.Supp.2d at 1290 n. 8. See also Voyager Ins. Cos. v.Whitson, 867 So.2d 1065, 1076 (Ala. 2003):
 "`If a party with full knowledge of the facts wrongly interprets them, so that he misperceives their legal significance, that wrong interpretation does not constitute a mistake of fact. . . . [It] constitutes a mistake of law rather than a mistake of fact, and a mistake of law does not preclude the application of the voluntary-payment doctrine.
 "`". . . . [I]t is equally well settled that money voluntarily paid with full knowledge of the facts but by reason of mistake of law cannot be recovered."'
 "[Stone v. Mellon Mortgage Co.,] 771 So.2d [451] at 458 [(Ala. 2000)] (quoting Sherrill v. Frank Morris Pontiac-Buick-GMC, Inc., 366 So.2d 251, 257 (Ala. 1978)(Torbert, C.J., concurring specially))." *Page 234